# EXHIBIT 4

B299946
Court of Appeals of California

# Monterroso v. Hydraulics Int'l

Decided Jan 4, 2022

B299946 B302722 B302723

01-04-2022

ARON MONTERROSO, Plaintiff and Appellant, v. HYDRAULICS INTERNATIONAL INC., Defendant and Appellant.

Troutman Pepper Hamilton Sanders, Jeffrey M. Goldman and Misha Tseytlin for Defendant and Appellant Hydraulics International, Inc. Alexander Morrison + Fehr, Tracy L. Fehr, J. Bernard Alexander, III; Law Offices of Hugo E. Gamez and Hugo E. Gamez for Plaintiff and Appellant Aron Monterroso.

---

ROTHSCHILD, P. J.

NOT TO BE PUBLISHED

APPEALS from a judgment and order of the Superior Court of Los Angeles County No. BC654053, Maureen Duffy-Lewis, Judge. Affirmed in part and reversed in part (B299946); affirmed (B302722, B302723).

Troutman Pepper Hamilton Sanders, Jeffrey M. Goldman and Misha Tseytlin for Defendant and Appellant Hydraulics International, Inc.

Alexander Morrison + Fehr, Tracy L. Fehr, J. Bernard Alexander, III; Law Offices of Hugo E. Gamez and Hugo E. Gamez for Plaintiff and Appellant Aron Monterroso.

1   ROTHSCHILD, P. J. *1

Aron Monterroso sued his former employer, Hydraulics International, Inc. (Hydraulics), based on allegations that the company fired him for taking leave to care for his mother after she suffered a stroke. After the court granted Hydraulics's motion summarily adjudicating several of Monterroso's claims and his request for punitive damages, Monterroso prevailed at trial on two causes of action: one based on the California Family Rights Act (the CFRA) (Gov. Code, § 12945.2 & Cal. Code Regs., tit. 2, § 7297.7), [1] and one based on Hydraulics's alleged failure to engage in the interactive process required under the Fair Employment and Housing Act (the FEHA) (§ 12900 et seq.). The jury awarded Monterroso economic and emotional distress damages. The court awarded Monterroso attorney fees in an amount close to the lodestar amount Monterroso had calculated, but denied Monterroso's request for twice the lodstar amount.

> [1] Unless otherwise indicated, all statutory references are to the Government Code.

In two consolidated appeals, each party appeals from the judgment and from the order awarding attorney fees. In the appeal from the judgment, Hydraulics challenges the verdicts against it on both claims as well as the amount of the damages award. Monterroso contends that the court erred in summarily adjudicating his punitive damages claim and several other causes of action. In the appeal from the order on attorney fees, Hydraulics challenges the amount awarded as unsupported by the evidence, whereas Monterroso challenges it based on the court's refusal to employ a multiplier.

We conclude that even if Hydraulics is correct that substantial evidence does not support a finding

2   that Monterroso *2 was told he was fired during

*Monterroso v. Hydraulics Int'l    No. B299946 (Cal. Ct. App. Jan. 4, 2022)*

his leave, and/or even if Monterroso's testimony to this effect was false, the record still contains substantial evidence to support the jury's verdict in Monterroso's favor on his CFRA claim. As to the jury's verdict on the FEHA claim, we conclude Hydraulics cannot be held liable for a failure to engage in the interactive process with Monterroso based on his mother's disability, because the FEHA does not authorize an interactive process claim based on such associational disability. Our holding in this regard does not require retrial or recalculation of damages, however, because Monterroso claimed the same harm under his CFRA and FEHA theories of liability.

We further conclude that none of the challenged aspects of the damages award or the court's summary adjudication of the punitive damages claim provides a basis for reversal or other relief on appeal.

Finally, we affirm the attorney fees award because the court did not abuse its discretion.

## FACTS AND PROCEEDINGS BELOW

### A. *Factual Background*

The following factual background is based on the evidence presented at trial.

### 1. *Hydraulics and Monterroso*

Hydraulics develops, manufactures, and supports a variety of systems used by the United States military. Hydraulics has strict attendance policies for its employees, pursuant to which an employee who is absent from work for three consecutive days without notifying a supervisor is considered to have abandoned his employment as of the morning of the third day. *3

Hydraulics employed Monterroso from August 1986 to March 2010, and from May 2010 to January 2016. For most of that time, Monterroso worked as a lead assembler in the component assembly department. For the majority of Monterroso's employment at Hydraulics, his supervisor was Milton Gaitan. After Gaitan was

promoted to manager of the assembly department, Manuel Gutierrez became Monterroso's direct supervisor. Gutierrez reported to Gaitan.

### 2. *Monterroso's leave to care for his mother*

After work on Friday, December 4, 2015, Monterroso learned that his mother, who lives in Guatemala, had suffered a stroke. He called Gaitan and asked for leave so he could go to Guatemala to arrange care for his mother, a request that Gaitan approved. Monterroso went to work the next day, but obtained Gutierrez's permission to leave early because he was upset about his mother.

Monterroso's sister purchased Monterroso a nonrefundable round-trip flight scheduled to depart Los Angeles on December 7, 2015 and return on Friday, January 8, 2016. Monterroso testified that, on December 7, 2015, before departing for Guatemala, Monterroso telephoned Gutierrez to confirm the specific dates he would be in Guatemala, and that he would return to work on Monday, January 11. Gutierrez testified that Monterroso may have told him the dates for Monterroso's leave during such a call, but that he could not recall what those specific dates were. Gutierrez also testified that he may have relayed any dates he did learn to Juanita Porras, a Hydraulics payroll administrator who also assisted with certain personnel matters (including leave requests), but he could not recall. Porras testified that Gutierrez informed her Monterroso was to return to work on Monday, *4 January 4 (not Monday, January 11). Gutierrez could not recall whether he did this.

In any event, it was undisputed at trial that Monterroso left Los Angeles for Guatemala on Monday, December 7, 2015 and returned to Los Angeles on Friday, January 8, 2016, but did not appear at Hydraulics until Tuesday, January 19, 2016.

### 3. *Conflicting evidence regarding when Hydraulics terminated Monterroso*

At trial, the parties presented conflicting evidence regarding when Hydraulics terminated Monterroso. Because this is an issue central to certain of Hydraulics's arguments on appeal, we summarize this evidence in detail below.

Hydraulics contends the evidence shows that it decided to terminate Monterroso on January 13, 2016, and communicated this to him on January 19, 2016. Monterroso contends that, on January 7, 2016, Hydraulics made the decision to terminate him, and that the company communicated this to him during a Saturday, January 9, 2016 phone call.

### a. *Evidence regarding January 9, 2016 phone call*

At trial, Monterroso testified that he spoke with Gutierrez by phone on Saturday, January 9, 2016, and that, during the call, Gutierrez told Monterroso he had been terminated. Monterroso testified that he had initiated the call "as a courtesy" to let the company know that he was back in Los Angeles and would be returning to work the following Monday, January 11, as planned. Monterroso testified that, in response to being told he was fired, he asked only whether he could pick up his check, and was told he could do so "any day." *5

5  Monterroso was cross-examined about documents Hydraulics characterized as containing his prior inconsistent statements regarding his termination date. Specifically, Monterroso was asked to explain why, in his verified response to an interrogatory asking for all facts supporting that Hydraulics decided to terminate him on January 7, Monterroso did not refer to the January 9 telephone call, and instead indicated that "[o]n January 19th, 2016, [Monterroso] met with . . . Gaitan at defendant's premises, and . . . Gaitan presented [Monterroso] with the termination letter/personnel action notice indicating" a January 7 decision to terminate him. Monterroso was also cross-examined regarding his verified Department of Fair Employment and Housing (DFEH) complaint, which alleged that, after Monterroso

returned from Guatemala, Hydraulics had asked him to report for work on January 19, and had informed Monterroso on that date that he was terminated. In response to these questions, Monterroso reiterated that he was telling the truth about the January 9 phone call. He acknowledged he had understood both documents, and signed the interrogatory responses under penalty of perjury, but maintained he did not write them.

Gutierrez testified that he did not tell Monterroso on January 9 that Monterroso had been terminated. Gutierrez's phone records from that day were admitted into evidence and do not show any incoming calls from either of Monterroso's phone numbers, although they do reflect a call from a blocked number.

### b. *January 13, 2016 documents and events*

On Wednesday, January 13-four days after the alleged phone call with Gutierrez -Monterroso texted Gutierrez, stating that he had provided Gutierrez with a doctor's note certifying his mother's illness and that Monterroso would "only be able to arrive *6 on Monday [presumably, January 18]. I'm fixing some problems I have." The text message does not mention Monterroso having been terminated.

Porras testified that, also on January 13, 2016, Gaitan decided to terminate Monterroso based on Monterroso not having reported to work for three consecutive days since his leave ended, in violation of company policies and requirements. Porras testified that, on January 13, she prepared a personnel action notice, or "PAN form," dated January 13, 2016, which indicated: "Granted time off for family emergency, on Dec[ember] 21, employee called would return on [Monday, ] Jan[uary] 4th as of this date no show, no call. Per Handbook employees with 3 days no show no call considered job abandonment."

The January 13, 2016 PAN form does not identify a specific termination date (rather, it refers only to Monterroso's leave ending Monday, January 4,

and deems Monterroso to have abandoned his job as of three days following that date). Other documents Porras prepared that day, however, contain an express January 7 termination date. Namely, in a form provided to Hydraulics's 401(k) plan administrator, Porras indicated that Monterroso was terminated on January 7, 2016. And a January 13, 2016 email from Porras to a Hydraulics human resources employee, with a copy to Gaitan, reads: "[Monterroso's] last day worked was Dec[ember] 5th left due [to] a medical emergency with his mother. Since then he has contacted Hydraulics on Dec[ember] 21[st] when he indicated he would be back by Jan[uary] 4th, he did not return and we have not heard from him. The decision has been made to consider this job abandonment (Balman agrees). Effective date of termination January 7th since this is 3 days no show no call from the date he was expected to return." *7

7

### c. *January 19, 2016 events*

It is undisputed that, after his time in Guatemala, Monterroso did not return to Hydraulics until Tuesday, January 19, 2016.[2] On that day, Monterroso tried to "punch in with his card"- meaning the "card where [Hydraulics] clock[s] in the time that [employees] enter"- while wearing his uniform. Monterroso testified that Gaitan informed Monterroso that morning he was to sign a termination letter, and that Monterroso, Gaitan, and Porras then signed the PAN form dated January 13, 2016. On this day, Monterroso also received his final paycheck and bonus check.

[2] In his testimony at trial, Monterroso was vague as to what he was doing during the approximately 10 days between January 9, 2016 (when, according to his testimony, he learned he was fired) and January 19 (when he returned to Hydraulics). He acknowledged, however, that from Thursday, January 14 through Sunday, January 17, 2016, he was in Chicago visiting the woman who is now his wife, and that he had booked this ticket several

months before taking leave. The record does not suggest Monterroso requested these days off work or informed Hydraulics that he would be unable to work on these days.

### 4. *Evidence regarding Monterroso's emotional and mental state after being terminated*

At trial, the jury heard lay and expert testimony regarding Monterroso's mental state after Hydraulics terminated him.

Monterroso testified that he was not "upset" when he learned that he lost his job, but rather "felt bad because [he] said how is it possible after working 29 years." Monterroso later testified that it "upset [him] to lose [his] job" "[b]ecause . . . [he] wasn't going to be able to continue to help [his] mother," that he "was losing sleep[, ] . . . had depression" and "would wake up at night suddenly *8 like when you're scared." He further testified that he had difficulty sleeping because he "kept thinking about work and how [he] would be able to resolve the problems that were coming to [him]." He testified that for approximately seven months after his termination, he rarely left his room. He "kept thinking of how bad Hydraulics had done by [him] since [he] had given them 29 years of [his] life" and he had been terminated when he "needed [his job] the most." He "felt humiliated," "ashamed," and "bad." He noticed changes in his own personality and behavior, such as hiding from his sister and walking slowly while looking downward. Monterroso's sister and brother-in-law testified that they noticed some of these changes in Monterroso after his termination as well.

Monterroso's psychological expert, Dr. Ines Monguio, diagnosed Monterroso with moderate clinical depression (major depressive disorder), chronic adjustment disorder with anxiety, and somatization disorder (somatic symptom disorder).[3] Monguio testified that these conditions were caused by Monterroso losing his job of 30 years, a job from which he had derived pride and a sense of purpose, for reasons he perceived to be

8

Monterroso v. Hydraulics Int'l   No. B299946 (Cal. Ct. App. Jan. 4, 2022)

unfair. "[T]he loss of the job was the proximate, largest, most important cause [of Monterroso's depression, ] made worse by the failure to be able to fulfill his obligations" as a son, because he could not help pay for his mother's care after her stroke. Monguio testified that Monterroso suffered from numerous physical symptoms in connection with the emotional *9 effects of his termination, including tension headaches, neck and shoulder pain, gastrointestinal problems and lack of appetite.

> 3 Monguio interviewed Monterroso for four hours and administered psychological tests, including the Structured Inventory of Malingering Symptomatology, the Milan Clinical Inventory, Multiaxial Inventory, and the Minnesota Multiphasic Inventory.

Monguio opined that Monterroso's depression prognosis was "fair to poor" and that he would always be vulnerable to depression. She recommended weekly treatment with a Spanish-fluent psychologist for six months to a year, and every two weeks for "a while," thereafter.

Hydraulics did not offer any expert testimony to rebut Monguio's opinions.

## 5. *Evidence regarding Monterroso's efforts to find new employment*

Monterroso testified that he attempted to find employment after he was terminated at Hydraulics. According to Monterroso, he looked for work with friends and in the Spanish newspaper *La Opinion*, and filled out a form on the EDD website, noting his work experience, but did not hear back. At some point after his termination, Monterroso moved to Chicago to live with his now wife, and unsuccessfully applied for work there as well.

Monterroso testified that his depression interfered with his ability to seek work. He further testified that he did not have the formal education and did not know which companies had assembly jobs comparable to his duties at Hydraulics. Ultimately,

Monterroso's wife suggested he clean homes with her, which he did, making $200 per week with no benefits.

## B. *Monterroso's Lawsuit and Proceedings Below*

Monterroso sued Hydraulics with a complaint alleging causes of action under the FEHA for age discrimination, disability discrimination, failure to accommodate, failure to engage in the interactive process, failure to prevent discrimination, and retaliation. The complaint also alleged causes of action for *10 wrongful discharge, violation of the CFRA, violation of Business and Professions Code section 17200, and intentional infliction of emotional distress. Monterroso sought damages for past and future economic losses, as well as emotional distress and punitive damages.

## 1. *Summary adjudication and jury verdict*

Hydraulics successfully moved for summary adjudication of Monterroso's request for punitive damages, as well as on five of Monterroso's causes of action. Monterroso's CFRA, FEHA disability discrimination, and FEHA interactive process claims proceeded to a jury trial.[4]

> 4 Monterroso elected not to proceed with his age discrimination and wrongful termination claims.

The jury returned a verdict rejecting Monterroso's FEHA disability discrimination claim, but found in Monterroso's favor on his CFRA and FEHA interactive process claims. Using a special verdict form, the jury more specifically found as to Monterroso's CFRA claim that Hydraulics had "[d]ischarge[d] . . . Monterroso while he was on family care leave" (capitalization omitted) and "[r]efused to return him to his job when his family care leave ended," and that his "request for family care leave was a substantial motivating reason for his discharge." As to his interactive process claim, the jury specifically found that Monterroso had "request[ed] that Hydraulics . . . make a reasonable accommodation to care for his mother and return to his job," but that Hydraulics "fail[ed]

to participate in a timely, good-faith interactive process with . . . Monterroso to determine whether reasonable accommodation could be made." (Capitalization omitted.) *11

The jury awarded plaintiff $1, 292, 063 in compensatory damages. The award consisted of $184, 291 in past lost earnings; $284, 772 in future lost earnings; $23, 000 in "[f]uture expenses: (mental)"; $550, 000 in past noneconomic damages; and $250, 000 in future noneconomic damages.

The economic damages amounts are consistent with the testimony offered by Dr. Tamorah Hunt, Monterroso's economic expert. Hydraulics did not offer any expert testimony regarding damages. Hunt calculated plaintiff's past lost earnings at $194, 951, using Monterroso's regular pay of $19.07 per hour, and increasing the hourly rate by 2.25 percent per year in 2017 and 2018, based on Monterroso's historical increases. The jury awarded the amount Hunt calculated for Monterroso's lost earnings, less approximately $10, 000. Using the same approach, Hunt calculated Monterroso's future loss of earnings at $284, 772, the exact amount the jury awarded.

## 2. *Appeal and cross-appeal from judgment (case No. B299946)*

In a single motion, Hydraulics sought a new trial on the CFRA claim, a new trial or judgment notwithstanding the verdict (JNOV) on the FEHA interactive process claim, and a new trial or conditional remittitur on the damages award.[5] *12

> [5] On appeal, Monterroso argues that Hydraulics's motion was not timely under Code of Civil Procedure section 659, because Hydraulics did not file its supporting memorandum and evidence within the requisite statutory timeframe. Monterroso confuses the timeframes applicable to supporting papers (governed by Code Civ. Proc., § 659a) and the time frame applicable to the notice of motion (governed by Code Civ. Proc., § 659, subd.

(a)). (See Code Civ. Proc., § 629.) Code of Civil Procedure section 659a requires that "[w]ithin 10 days of filing [a] notice [of intent] . . . the moving party shall serve upon all other parties and file any brief and accompanying documents, including affidavits in support of the motion." Hydraulics's supporting papers and evidence complied with these deadlines.

The trial court denied Hydraulics's motion. Hydraulics appealed the denial, and Monterroso cross-appealed, challenging certain of the court's summary adjudication rulings.

## 3. *Appeal and cross-appeal from attorney fees award (case Nos. B302722 & B302723)*

Monterroso filed a motion for attorney fees, requesting a lodestar amount of $692, 616, plus a 2.0 multiplier. The trial court awarded Monterroso $625, 000 in attorney fees and denied Monterroso's request for a multiplier. Hydraulics timely appealed from the attorney fees award, challenging the amount of the award as excessive. Monterroso cross-appealed, challenging the trial court's denial of a multiplier. This court consolidated the appeals in case Nos. B299946, B302722, and B302723 for purposes of briefing, oral argument and decision. *13

### DISCUSSION

### I. Appeal from Judgment (Case No. B299946)

In its appeal from the judgment below, Hydraulics argues this court should (1) remand for a new trial on the CFRA claim, because the trial court abused its discretion in denying Hydraulics's motion for a new trial, despite Monterroso offering what Hydraulics characterizes as false testimony on a crucial point, and because substantial evidence does not support the CFRA verdict; (2) reverse the judgment on Monterroso's interactive process claim, because association with a disabled individual is not a legally cognizable basis for such a claim; and, alternatively, (3) reduce the

jury's damages award, which Hydraulics argues is so grossly disproportionate that it must be the product of passion and prejudice.

Monterroso's cross-appeal from the judgment argues that the trial court erred in various ways in granting Hydraulics's summary adjudication motion regarding Monterroso's failure to prevent discrimination, retaliation, and reasonable accommodation claims. He also argues the court erred in summarily adjudicating Monterroso's punitive damages request, because Hydraulics did not meet its burden of producing evidence that none of the persons involved in the decision to terminate him were managing agents or that Hydraulics did not act with the requisite malice.

We address each of these arguments in turn below.

### A. *CFRA Claim*

Hydraulics argues that substantial evidence does not support the jury's verdict on the CFRA claim, because the jury's special finding that Monterroso was terminated while on CFRA leave "was almost certainly a result of false testimony" regarding the

14   \*14 January 9 phone call, and that no reasonable jury could have found the testimony credible. Hydraulics challenges the court's denial of his motion for a new trial on essentially the same basis, contending the court abused its discretion by "fail[ing] to exercise its power and duty to act 'as a thirteenth juror.' "

The CFRA "is intended to give employees an opportunity to take leave from work for certain personal or family medical reasons without jeopardizing job security." (*Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 606.) In general, the CFRA makes it an unlawful employment practice for an employer of 50 or more persons to refuse to grant an employee's request to take family care and medical leave, up to a certain amount of time. (§ 12945.2, subds. (a) & (b)(2)(A); see generally *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1253-1254 (*Avila*).) The CFRA also requires that an

employer not take any adverse action against the employee because he or she took family care leave. (See § 12945.2, subd. (k)(1) ["[i]t shall be an unlawful employment practice for an employer to . . . discharge . . . any individual because of . . . [¶] . . . [a]n individual's exercise of the right to family care and medical leave"].) Here, it is undisputed that Hydraulics approved, and Monterroso took, CFRA leave, so his CFRA claim is based on Hydraulics's "retaliation [against him] for taking CFRA leave"-specifically, terminating him because he took leave.

In challenging the CFRA verdict, Hydraulics argues that Monterroso falsely testified that Gutierrez told him during a January 9 phone call that he was fired, that no other evidence supports that Monterroso was fired on or before that day, and that the record is otherwise inconsistent with such a phone call. More specifically, Hydraulics argues that Monterroso's testimony was inconsistent with allegations in his complaint and his DFEH filing that he was terminated on January

15   19, the latter of which \*15 he verified under penalty of perjury. Hydraulics further argues Monterroso's testimony is also inconsistent with his not mentioning the call in his interrogatory responses listing the evidentiary bases for his contention that the company decided to terminate him on January 7, as well as with his attempt on January 19 to "punch in" at Hydraulics while wearing his uniform. Monterroso was cross-examined about these inconsistencies, and the jury ultimately found him credible despite them. We must defer to the jury's evaluation of the credibility of witnesses unless the testimony was inherently implausible in light of the entire record. (See *People v. Jones* (1990) 51 Cal.3d 294, 314 [" [I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's

credibility for that of the fact finder."]; accord, *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*).)

In any event, even if, as Hydraulics argues, Monterroso falsely testified about the January 9 phone call, Monterroso still presented substantial evidence to support the jury's CFRA verdict. Hydraulics's argument to the contrary assumes that Monterroso being informed he was terminated during the January 9 phone call was necessary to the jury reaching its verdict on the CFRA claim. Neither the law nor the special verdict form supports this assumption.

The special verdict form's special finding that Monterroso was terminated while on leave was not necessary to the jury's verdict on the CFRA claim. That form allowed the jury to find for Monterroso on the CFRA claim on one or more of the following bases: that Hydraulics "[r]efuse[d] to give him family care leave," "[d]ischarge[d] [him] while he was on family care leave," *or* *16 "[r]efuse[d] to return him to his job when his family care leave ended." The jury found *both* that Hydraulics terminated Monterroso while he was on leave *and* that it had refused to return him to his job following leave. Given the structure of the special verdict form, either finding alone was sufficient to allow the jury to continue and answer the questions that followed-namely, to determine whether Monterroso's leave was "a substantial motivating reason" for his termination, whether Monterroso was harmed as a result of his discharge, and whether Hydraulics's conduct was a "substantial factor in causing" that harm. The jury answered all of these questions in the affirmative. On appeal, Hydraulics does not challenge the sufficiency of the evidence to support the finding that Hydraulics "[r]efuse[d] to return him to his job when his family care leave ended." Even if Hydraulics is correct that Monterroso falsely testified regarding the January 9 phone call, this would not change or undermine the evidence that Hydraulics did not permit Monterroso to return to work after his leave was over.

Finally, to the extent Hydraulics's argument can be construed as a challenge to the sufficiency of the evidence to support that Monterroso's leave was "a substantial motivating reason" for his discharge, we likewise disagree. As reflected in the special verdict form, Monterroso only had the burden of proving that "[he] suffered . . . termination . . ., because of [his] exercise of [his] right to CFRA leave." (*Avila, supra,* 165 Cal.App.4th at p. 1254; see *Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 261 ["the elements of a cause of action for retaliation in violation of CFRA . . . are . . . (1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA leave; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse *17 employment action, such as termination . . . because of her exercise of her right to CFRA leave"].) Such retaliatory causation can be established by an employer "counting CFRA leave as absences under a no-fault attendance policy." (*Avila, supra,* 165 Cal.App.4th at p. 1254.) The jury was presented with Hydraulics documents reflecting that Hydraulics decided to terminate Monterroso for failure to report to work while he was still on CFRA leave (from January 4 to January 7). That this evidence may be contradicted or undermined by other evidence in the record is not dispositive when reviewing the verdict for substantial evidence. (See *Estate of Leslie* (1984) 37 Cal.3d 186, 201 [in reviewing for substantial evidence, all conflicts in the evidence should be resolved in favor of the respondent]; *Marriage of Mix* (1975) 14 Cal.3d 604, 614 [testimony of a single witness, including the plaintiff, can constitute substantial evidence]; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 889 (*Shade Food*) [" '[t]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury' "].) The jury was entitled to reject Hydraulics's characterization

of these documents as reflecting an innocent misunderstanding about the timing of Monterroso's leave.

Hydraulics argues that, because these documents were all *executed* on January 13, regardless of the dates they contain, they actually constitute evidence that the company terminated Monterroso on January 13 after he failed to report for work following his leave. But these documents expressly identify January 7 as the effective date of Monterroso's termination. A jury theoretically could have chosen to interpret these January 7 references as typographical errors and to instead deduce a termination date from them based on the date they were executed. *18 But that is not the only possible interpretation of these documents. And Hydraulics points to no documents in the record containing a January 13 termination date. The only other evidence in the record supporting a January 13 termination date is the testimony of Porras-the author of the very documents her testimony contradicts.

Although we acknowledge that the record contains evidence that could reasonably support Hydraulics's version of events, our view of the strength of that evidence and the weakness of Monterroso's credibility is not the issue. Rather, the question is whether the record contains substantial evidence supporting the verdict. The answer to that question is that the record does.

**B.** *FEHA Interactive Process Claim*

Monterroso prevailed at trial on his interactive process claim on the theory that the FEHA permits such a claim to be based not just on an employee's own physical disability, but on an employee's association with someone who has a physical disability-here, Monterroso's mother after she suffered a stroke. We will refer to such a theory as one of "associational disability." As discussed below, however, unlike the list of protected characteristics used in some sections of the FEHA-a list the FEHA expressly defines as including associational disability-the FEHA does not include associational disability in the definition of any of the language used in the reasonable accommodation and interactive process sections.

The FEHA contains two companion requirements related to an employer's duty to provide reasonable accommodation for a disabled employee. Section 12940, subdivision (m), first obligates employers "to make reasonable accommodations for the known physical or mental disability of an applicant or employee." To assure that the burden is not placed on the employee to alone *19 identify what reasonable accommodations might be required, section 12940, subdivision (n), further requires an employer "to engage in a timely, good faith, interactive process with [an] employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." Neither section expands the concepts of physical disability, mental disability, or known medical condition to include associational disability. Nor do the general FEHA definitions of "[p]hysical disability," known "medical condition" or "[m]ental disability" contain any mention of associational disability. (§12926, subds. (i), (j) & (m).)

Monterroso argues that we should nevertheless read associational disability into the definition of "physical disability" employed in the interactive process section. To support this argument, he relies on section 12926, subdivision (o), with which the Legislature expressly incorporated the concept of associational disability into *other* FEHA language-language that does not appear in the sections governing either interactive process or reasonable accommodation claims, but instead appears in sections addressing FEHA discrimination and harassment claims.

Monterroso is correct that section 12906, subdivision (o) includes associational disability in its list of so-called protected characteristics, based on which the FEHA prohibits an employer from, for example, discriminating or harassing an employee:" '[r]ace, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, age, sexual orientation, or veteran or military status.'" (§ 12926, subd. (o).) Specifically, section 12926, subdivision (o) clarifies that this list "includes a perception that the person has any of those characteristics or that the person is *20 associated with a person who has, or is perceived to have, any of those characteristics." (*Ibid.*) Thus, section 12906, subdivision (o) incorporates associational disability into only instances where the FEHA employs its list of protected characteristics; for example, into the code sections governing disability discrimination. (See § 12940, subds. (a)-(d) & (j)(1).)

"When '" "a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted." '" [Citations.]" (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 850.) Thus, the statutory scheme as a whole reflects a conscious decision by the Legislature *not* to impose reasonable accommodation or interactive process obligations on an employer based on an employee's association with a disabled individual.

Our interpretation of the FEHA provisions governing interactive process claims is consistent with the legislative history of section 12906, subdivision (o). When the Legislature added section 12906, subdivision (o) to the FEHA and thereby expanded the list of protected characteristics to include associational disability, it did so in a bill seeking to expand the scope of FEHA's protections against *discrimination* specifically. An analysis by the Assembly

Judiciary Committee staff describes the bill as "clarif[ying] that FEHA's protections against housing and employment *discrimination* cover associational rights as well, i.e., *discrimination* based upon perceptions about who one may be associating with will now be protected under the Act." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999-2000 Reg. Sess.) May 11, 1999, p. 15, italics added.) The "key issue" raised by the bill was whether "various civil rights statutes [should] be amended to strengthen *discrimination* protections or clarify *21 ambiguities in the law" and describes the bill as " [c]larif[ying] that protections against housing and employment *discrimination* cover . . . the right to freely associate." (*Id.* at p. 1, italics added; see also *id.* at p. 15.) Further, a goal of the legislation was to harmonize "particular provisions of state *discrimination* laws" with "federal . . . employment laws in these areas" in order "to facilitate the 'vigorous enforcement' of our anti-*discrimination* laws." (*Id.* at p. 4, italics added.) Under federal law, associational disability does not trigger an interactive process obligation. (See, e.g., *Erdman v. Nationwide Ins. Co.* (3d Cir. 2009) 582 F.3d 500, 510 ["[a]lthough refusal to 'mak[e]' reasonable accommodations' may constitute illegal discrimination against a disabled employee [citation], the plain language of the [Americans with Disabilities Act of 1990 (ADA)] indicates that the accommodation requirement does not extend to relatives of the disabled" (italics omitted)]; *Larimer v. International Business Machines* (7th Cir. 2004) 370 F.3d 698, 700 ["the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person"].)

Such federal authority supports our interpretation of the FEHA. "Where . . . the particular provision in question in the FEHA is similar to the one in the ADA, the courts have looked to decisions and regulations interpreting the ADA to guide construction and application of the FEHA." (*Hastings v. Department of Corrections* (2003)

110 Cal.App.4th 963, 973, fn. 12; accord, *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 165.) The FEHA and ADA contain virtually identical language governing interactive process and reasonable accommodation claims. (Compare § 12940, subd. (m)(1) [requiring employers "to make reasonable accommodation for the known physical or mental disability of an applicant or employee"] with 42 U.S.C. § 12112, *22 subd. (b) (5)(A) [requiring employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee"].) California courts have thus looked to persuasive federal authority analyzing ADA interactive process claims when analyzing FEHA interactive process issues. (See, e.g., *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 979-980.) Such persuasive federal authority supports our holding that the FEHA does not include an interactive process claim based on associational disability.

In sum, statutory language that neither appears in nor applies to the code sections governing interactive process claims (or those governing reasonable accommodation claims), and that was added to the FEHA for the purpose of expanding discrimination laws, does not permit us to expand the FEHA's interactive process protections to include associational disability.[6] Nor do we see any other basis in the statutory language for interpreting the FEHA *23 as requiring an interactive process based on an employee's known associational disability. Accordingly, we reverse the judgment on Monterroso's associational disability interactive process claim, as it is not a cognizable claim under the FEHA.

[6] Monterroso cites language in *Castro-Ramirez v. Dependable Highway Express, Inc.* (2016) 2 Cal.App.5th 1028, suggesting that the FEHA "may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person." (*Id.* at p.

1039.) *Castro-Ramirez,* however, was a FEHA discrimination case, and the court's comment regarding associational disability reasonable accommodation claims is at most dicta for the proposition urged by Monterroso. (See *id.* at pp. 1038-1039.) The court in *Castro-Ramirez* itself noted: " [W]e do not decide this point. We only observe that the accommodation issue is not settled and that it appears significantly intertwined with the statutory prohibition against disability discrimination." (*Id.* at p. 1039.) In any event, we disagree that section 12926 can provide a basis for expanding the scope of interactive process or reasonable accommodation claims for the reasons discussed herein.

### C. *Summary Adjudication of Monterroso's FEHA Reasonable Accommodation, Failure to Prevent Discrimination, and Retaliation Causes of Action*

**1.** *Reasonable accommodation cause of action*

Monterroso challenges the court's summary adjudication of his reasonable accommodation claim. As discussed above, however, the FEHA does not recognize a reasonable accommodation claim based on associational disability for the same reasons it does not recognize an interactive process claim based on associational disability. (See Discussion, part I.B, *ante.*) Thus, even though this was not the basis for the trial court's ruling, the court properly granted Hydraulics's motion for summary adjudication of this claim. (See *Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 ["where there is no genuine issue of material fact, the appellate court should affirm the judgment of the trial court if it is correct on any theory of law applicable to the case, including but not limited to the theory adopted by the trial court"].)

**2.** *Retaliation cause of action*

Monterroso next challenges the summary adjudication of his FEHA retaliation claim. A FEHA retaliation claim is based on section 12940, subdivision (h), which declares it unlawful for "any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).) In order to prevail on such a claim, Monterroso must *24 prove that Hydraulics took some adverse employment action against him because he "opposed any practices forbidden under [the FEHA] . . . or . . . filed a complaint, testified, or assisted in any proceeding under this part." (*Ibid.*; see *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 987-988 [FEHA retaliation "plaintiff must show that the motive [for employer's actions] was retaliatory animus"].) The record before the court at the summary judgment stage plainly established Monterroso did not file his complaint or otherwise oppose the actions he claims violated the FEHA until after Hydraulics had already terminated him. Hydraulics could not have fired Monterroso in retaliation for actions Monterroso had not yet taken. The court thus properly summarily adjudicated Monterroso's FEHA retaliation claim.

### 3. *Failure to prevent discrimination cause of action*

Finally, Monterroso challenges the summary adjudication of his failure to prevent discrimination claim. (See § 12940, subd. (k) [unlawful for employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring"].) Unlike interactive process or reasonable accommodation claims, FEHA discrimination and failure to prevent discrimination claims *can* be based on associational disability, because the code sections providing for them include the phrase

section 12926, subdivision (o) defines as including associational disability. (See Discussion, part I.B, *ante*.)

Monterroso's failure to prevent cause of action suffers from another fatal deficiency, however. Namely, actionable discrimination or harassment is a necessary element of a failure to prevent claim (*Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1317-1318; *id.* at p. 1317 ["[i]t would be *25 anomalous to provide a remedy for failure to prevent acts that are not 'unlawful' under the FEHA"]), and Monterroso does not challenge the jury's conclusion that he did not suffer actionable discrimination. Of course, the jury had not made this finding at the time the court summarily adjudicated Monterroso's failure to prevent discrimination claim. Nevertheless, given that Monterroso implicitly concedes that the jury negated a necessary element of his failure to prevent discrimination claim, any error in the trial court's summary adjudication of that claim cannot have prejudiced Monterroso. We must therefore affirm the challenged ruling and need not consider whether the trial court erred, as such error would not be reversible in any event. (*Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853-854 ["A miscarriage of justice should be declared only when the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error. [Citations.] Prejudice from error is never presumed but must be affirmatively demonstrated by the appellant."])

### D. *Our Holding Regarding the Judgment Does Not Require A New Trial on Damages*

The verdict form did not require the jury to indicate whether the damages the jury awarded were attributable to Monterroso's CFRA claim, his interactive process claim, or both. Thus, Hydraulics argues that, if we conclude (as we do above) that liability is proper on only one of these

bases, we should remand for further proceedings to determine damages based solely on the one remaining claim. We disagree.

As a preliminary matter, "[c]ourts have held . . . that a defendant who fails to request a special verdict segregating the elements of damages forfeits the right to challenge a separate *26 element of damages on appeal." (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1053 (*Gillan*).)

More importantly, the CFRA and interactive process claims are based on the exact same actions and allege the exact same harm. The relevant damages evidence is thus the same regardless which legal theory of liability prevails. In arguing to the contrary, Hydraulics cites *Simers v. Los Angeles Times Communications LLC* (2018) 18 Cal.App.5th 1248, in which the reviewing court "agree[d] with the trial court's conclusion that it is impossible to separate 'what damages may have been awarded for the discrimination alone from what noneconomic damages were awarded that included a constructive discharge'-that is, damages for plaintiff's distress arising from 'the effect and consequences of that discharge,' an event 'of a very different character than a voluntary resignation.'" (*Id.* at p. 1278.) But here, the CFRA and the interactive process claims both assert Monterroso's termination and resulting emotional and economic harm as the basis for and measure of damages. *Simers* is thus inapposite. The other case on which Hydraulics relies for this point, *Gillan, supra,* 147 Cal.App.4th 1033, is likewise distinguishable. In that case, the plaintiff was entitled to damages only for his false arrest and not for any subsequent conduct, yet significant evidence and argument regarding damages arising from the subsequent conduct was presented at trial. (*Id.* at pp. 1052-1053.) Here, the jury did not hear any evidence of damages from conduct that was only part of the basis for Monterroso's FEHA claim, as opposed to his CFRA claim, because Monterroso claimed the same injury and damages under both theories of recovery. *27

27

## E. *Compensatory Damages Award*

Hydraulics next challenges the amount of the jury's economic and noneconomic damages awards, arguing that they are excessive and that substantial evidence does not support them. We will reverse a damages award as excessive only when "the entire record, when viewed most favorably to the judgment, indicates [the damages award] [was] rendered as the result of passion and prejudice on the part of the jurors." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12 (*Bertero*); *Don v. Cruz* (1982) 131 Cal.App.3d 695, 707 ["[w]here the evidence relates to the amount of damages . . . a damage award is not supported by substantial evidence if it is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice"].) In assessing whether this is the case, "[a] court may consider, in addition to the amount of the award, indications in the record that the fact finder was influenced by improper considerations." (*Don v. Cruz, supra,* at p. 707.)

Hydraulics relies solely on the amount of the damages award in relation to the evidence Monterroso presented at trial as an indicator that the award must be the product of passion and prejudice. Monterroso offered testimony of a damages expert to support the amount of his economic damages award, as well as testimony of a psychological expert that he suffered a "tremendous[ ] trauma[ ]" and depression as a result of his termination. Monterroso testified consistent with the unchallenged psychological expert opinion that he felt depressed and ashamed as a result of being terminated, the way he was terminated, and his difficulty supporting his mother financially as a result of his termination. *28

28

### 1. *Emotional distress damages*

Hydraulics does not challenge the reliability of the psychological expert's opinions, nor did Hydraulics offer contrary expert testimony on the subject. Rather, Hydraulics criticizes Monterroso's

testimony about his emotional state after he lost his job, arguing the testimony is internally inconsistent. Hydraulics also suggests that the distress Monterroso suffered may have been caused, not by his termination, but rather by his mother's illness and/or other stressors in his life, a theory Monterroso's expert expressly disagreed with. To the extent Hydraulics asks us to usurp the role of the jury and reach a different conclusion than the jury did regarding the credibility of Monterroso and his expert, we may not do so. (*Ochoa, supra*, 6 Cal.4th at p. 1206; *Shade Foods, supra*, 78 Cal.App.4th at p. 889.) To the extent Hydraulics argues this evidence, even if credible, is insufficient to support the award amount, we disagree. A reasonable jury could have concluded that the uncontradicted testimony presented was sufficient to support the noneconomic damages award. (See *Bertero, supra*, 13 Cal.3d at pp. 64-65 ["[i]n view of the testimony elicited by Bertero on the issue of damages and considering the defendants' complete failure to attempt in any way to rebut such testimony, we conclude that . . . the compensatory damage award is not excessive" (fn. omitted)].)

Hydraulics also argues that the emotional distress award is disproportionate to the injury suffered because it is several times the amount of Monterroso's annual salary while working at Hydraulics. But Hydraulics cites no authority for the proposition that a plaintiff's emotional distress resulting from loss of work should be measured by the amount of income the plaintiff lost. Rather, "[t]he fixing of [emotional distress] damages has long been vested in the sound discretion of the trier of fact [citation] subject *29 only to the passion and prejudice standard [citation]." (*Bertero, supra*, 13 Cal.3d at p. 64.) On the current record, we cannot say that the award amount is so high that it is necessarily the product of passion or prejudice.

**2.** *Economic damages award*

In challenging the economic damages amount, Hydraulics argues that the law does not permit Monterroso to recover for damages he could have easily avoided by making reasonable efforts to seek comparable new employment, and that the evidence does not reflect Monterroso made such efforts to mitigate his damages. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1043.) But Monterroso testified that he sought alternative employment after Hydraulics terminated him. That Hydraulics views Monterroso's efforts to find new employment as insufficient, or his testimony on this point as "vague[ ]" does not mean a jury could not conclude otherwise. Moreover, "[t]he defendant bears the burden of pleading and proving a defense based on the avoidable consequences doctrine" and a failure to mitigate. (*Id.* at p. 1044.) Hydraulics offered no evidence to support its claim that Monterroso could have obtained better employment, or could have obtained employment sooner.

Hydraulics's challenge to the compensatory damages award is without merit.

**F.** *Summary Adjudication of Punitive Damages*

Monterroso argues the court erred in granting Hydraulics's motion for summary adjudication on his request for punitive damages.

A plaintiff may not recover punitive damages unless "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, *30 subd. (a) [addressing punitive damages "for the breach of an obligation not arising from contract"].) In addition, a corporation will only be liable for punitive damages based on acts ratified, authorized, or committed by a corporate officer, director, or managing agent. (Civ. Code, § 3294, subd. (b); *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1151.) Thus, in order to prevail on its summary judgment motion regarding punitive damages, Hydraulics needed to establish below that, drawing all reasonable inferences in

favor of Monterroso, the undisputed facts prevented Monterroso from establishing at least one of these two elements. (See Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) Moreover, under the burden-shifting framework applicable to summary judgment motions, Hydraulics needed to "present evidence, and not simply point out that [Monterroso] does not possess, and cannot reasonably obtain, needed evidence." (*Aguilar*, *supra*, at p. 854, fn. omitted.)

Monterroso argues that Hydraulics failed to identify undisputed facts establishing that no Hydraulics "managing agent" acted with the requisite malice, that the undisputed facts do not prevent a triable issue of fact on these issues, and that the trial court erred in concluding otherwise. In an appeal challenging a summary adjudication ruling," 'we exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." [Citation.] "The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later. [Citation.] Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve *31 doubts about the propriety of granting the motion in favor of the party opposing it." '" (*Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 365 (*Davis*).)

To prove an employee is a managing agent, "a plaintiff seeking punitive damages . . . [must] show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 577 (*White*).) Put differently, managing agents are "only those corporate employees who exercise substantial independent authority and judgment in their

corporate decision[-]making so that their decisions ultimately determine corporate policy." (*Id.* at pp. 566-567.)

Monterroso correctly notes that the only evidence Hydraulics offered regarding the relevant employees' ability to shape corporate policy are the declarations of Porras and Gaitan. Gaitan's declaration provides that Gaitan was an assembly manager with "two supervisors under [his] purview," under whom were approximately 11 leads. Porras's declaration indicated she was a payroll administrator whose duties included "dealing with payroll, processing employee leave requests, and maintaining employee personnel files." Both declarations also include the following language: "I am not involved in Hydraulics'[s] corporate decision-making, or in shaping the corporate policy of Hydraulics. I am not, and have never been an officer, director, or managing agent of Hydraulics."

Monterroso argues this isn't enough to satisfy Hydraulics's initial burden under the *Aguilar* burden-shifting framework, and that Monterroso's motion thus necessarily fails. In this regard, Hydraulics relies primarily on *Davis*, *supra*, 220 Cal.App.4th 358. In that case, the defendant sought to summarily adjudicate the plaintiff's punitive damages request based solely on a declaration *32 of the relevant employee providing that the employee" '[had] never drafted corporate policy or had substantial discretionary authority over decisions that ultimately determine [the company's] corporate policy. The only role that [the employee] play[ed] with respect to [the company's] anti-harassment and [Equal Employment Opportunity (EEO)] policies is to ensure that [the employees] are followed on the job." (*Id.* at p. 369, italics omitted.) The court concluded that this "statement was insufficient to satisfy [defendant's] initial burden of production to make a prima facie showing that [the employee] was not its managing agent" (*ibid.*) because it "state[d] a legal conclusion by simply parroting the *White* standard" (*ibid.*) and "did not contain a

sufficient description of his job duties and responsibilities and the nature and extent of his authority and discretion . . . as well as his exercise of that authority and discretion." (*Id.* at pp. 369-370.) Monterroso argues that Hydraulics failed to meet its initial burden in the same way the moving defendant in *Davis* did, and that its motion must therefore fail.

Even if Monterroso is correct, however, this was not the only evidence before the trial court at the summary adjudication hearing, because Monterroso offered evidence in opposition as well. We must base our analysis on this entire body of evidence presented to the trial court-not just the declarations offered by Hydraulics. To do otherwise would be to sacrifice the broader goal of summary adjudication motions-" 'avoid[ing] a . . . trial' rendered 'useless' by nonsuit or directed verdict or similar device"-in the name of a burden-shifting framework that exists solely to facilitate that goal. (*Aguilar, supra,* 25 Cal.4th at p. 855 [summary judgment procedures "may be reduced to, and justified by, a single proposition: If a party moving for summary judgment in any action . . . would prevail at trial without submission of any 33 issue *33 of material fact to a trier of fact for determination, then he should prevail on summary judgment"].)

The universe of undisputed facts presented to the court below in hearing Hydraulics's punitive damages motion includes information that distinguishes it from *Davis*-namely, deposition testimony establishing the relevant employees' job duties and discretion, based on which no reasonable jury could conclude that either was a managing agent of Hydraulics. Monterroso's statement of undisputed facts and supporting evidence reflects that Gaitan was responsible for managing and supervising 72 employees, including 11 leads; had the authority to decide to terminate employees; was responsible for forecasting productivity for top management; and oversaw the department that builds and manufactures important components ordered by

the Navy and Army. Monterroso also presented evidence that Porras independently ran payroll for 395 employees, independently issued discipline to employees, and issued written warnings without verbal warnings.

Given this evidence, a jury could not reasonably conclude that Gaitan or Porras meets the definition of "managing agent" set forth in the case law. (*White, supra,* 21 Cal.4th at p. 566.) None of the job duties reflected in the evidence suggests Porras or Gaitan made decisions that shaped corporate policies-that is, "formal policies that affect a substantial portion of the company and that are [of] the type likely to come to the attention of corporate leadership." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 715.) The fact that an employee has a supervisory position with the power to terminate employees under his or her control-even one in which he supervises a large number of employees-does not, by itself, support such a conclusion. (*White, supra,* 21 Cal.4th at pp. 566, 576-577; *Muniz v. United Parcel Service, Inc.* (N.D.Cal. 2010) 731 F.Supp.2d 961, 976-977 *34 [fact that operations manager was" 'in charge of 6 divisions, 23 package centers and approximately 40 managers, 150 supervisors and 4, 200 employees'" insufficient to raise triable issue whether he was managing agent, absent evidence that he set corporate policy].) Given the duties reflected in the deposition testimony Monterroso offered, a jury simply could not conclude that either Porras or Gaitan had "ultimate supervisory and decisional authority" to the extent necessary to establish managing agent status. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 823 (*Egan*).)

In arguing to the contrary on appeal, Monterroso mischaracterizes the deposition testimony he offered below. Namely, Monterroso contends that this testimony establishes that Gaitan "could choose not [to] enforce the rules in the Employee Handbook" and that Porras "had the authority to deviate from company policies as she chose." But the evidence Monterroso characterizes in this way

includes no indication that Gaitan had such authority. And Porras's testimony Monterroso cites merely includes a colloquy during which Porras indicated that, although the employee handbook provided employees should directly submit grievances about an adverse employment action directly to the human resources manager in writing, Porras and other human resources employees might, under certain circumstances, "get [an employee seeking such review] with somebody to talk to" if "it's something right there in the minute that we need to deal with." Finally, Monterroso presents as an undisputed fact that Porras "had the authority to review company policy and made additions to policy." But the deposition testimony cited for this claim reflects that Porras was among the human resources employees who would "review" the employee handbook draft prepared by attorneys to "make sure if there's anything that we'd like to see added," and *35 that she "[could] make a suggestion, but it[ ] [was] ultimately not [her] call."

Even if Porras and Gaitan had some limited authority-either officially or in practice-to deviate from procedures set forth in the employee handbook under certain circumstances, a reasonable jury could not infer from these facts any meaningful authority to shape "the general principles which guide [Hydraulics], or rules intended to be followed *consistently over time* in [Hydraulics] corporate operations." (*Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 167 (italics added) [so defining "corporate policy" in this context].) The ability to make the occasional exception to employee grievance procedures is hardly an ability to shape the general principles and rules "followed consistently over time" at the corporation (*ibid.*), and does not establish "substantial authority over decisions that set . . . *general principles and rules.*" (*Id.* at p. 168, italics added.) Nor does the ability to make suggestions about the employee handbook that the company is not obligated to adopt.

In this respect, *Davis* is distinguishable from the instant matter. The undisputed facts in *Davis* indicated not only that one of the two relevant employees" 'had broad discretion relating to personnel issues and the allocation of resources to meet project goals'" but also discretion "to allow the use and possession of alcohol on the [jobsite] by [the company's] employees despite its written corporate policy prohibiting it" and "the authority and discretion to not initiate an investigation into the . . . [incident that formed the basis of the lawsuit] despite [the company's] written policy requiring an immediate investigation by a trained employee or third party investigator." (*Davis, supra,* 220 Cal.App.4th at pp. 367-368.) The other relevant employee in *Davis* was the company's "EEO officer and was responsible for *36 administering its policies for prevention of discrimination, retaliation, and harassment based on gender and other protected classes for its entire Northwest District, including California. . . . [A]ll onsite EEO officers were trained to send all concerns about policy violations to [him]," and he "conducted training and conducted or oversaw [the company's] investigations relating to alleged discrimination, retaliation, or harassment." (*Id.* at p. 368.) The undisputed facts here reveal no such far-reaching influence over the company's FEHA policies or broad discretion on key issues unrestricted by written corporate policy.

We acknowledge that, under certain circumstances, even if an employee does not have an official policy-shaping role, the employee's discretionary decisions can shape *de facto* corporate policy. (See *White, supra,* 21 Cal.4th at p. 580 (conc. opn. of Mosk, J.).) But no such circumstances are present here. In *White,* for example, the employee was a zone manager responsible for running virtually all aspects of eight stores that reflected a significant portion of the company's business. (*Id.* at p. 577.) Under these circumstances, the employee "exercised substantial discretionary authority over vital aspects of [the company's] business that included

managing numerous stores on a daily basis and making significant decisions affecting both store and company policy." (*Ibid.*) As part of this, the employee routinely "exercised authority that 'necessarily result[ed] in the ad hoc formulation of policy' that adversely affected plaintiff. [Citation.] Specifically, she engaged in a local practice of retaliating against, by firing, an employee who testified at the unemployment hearing of another . . . employee." (*Id.* at p. 580 (conc. opn of Mosk, J.); *id.* at p. 577 ["[i]n firing [the plaintiff] for testifying at an unemployment hearing, [an employee] exercised substantial discretionary authority over decisions that ultimately *37* determined corporate policy in a most *37* crucial aspect of [the company's] business"].) This is nothing like Porras's and Gaitan's occasionally permitting a grievance to proceed verbally as opposed to in writing as required by the employee handbook. Nor does the case law support Monterroso's contention that Gaitan firing *one* employee (Monterroso) "resulted in the ad hoc formulation of corporate policy" regarding CFRA leave. Both Porras and Gaitan testified that their ability to make decisions regarding firing and employee discipline were guided and limited by written company policy. There is no evidence suggesting either employee routinely deviated from those policies, nor any evidence that the manner in which they routinely exercised their limited discretion otherwise created unofficial Hydraulics corporate policy in any area. (*Cf. Egan, supra,* 24 Cal.3d at p. 823 [because insurance company employees "dispose[d] of insureds' claims with little if any supervision, they possess[ed] sufficient discretion for the law to impute their actions concerning those claims to the corporation" and their actions "necessarily result[ed] in the ad hoc formulation of policy"].)

Thus, the evidence before the trial court at the summary judgment stage regarding the discretion and job duties of Porras and Gaitan did not raise any material question of fact as to whether either had an official or a de facto role in shaping corporate policy at Hydraulics. The jury could not have found that they were managing agents whose actions could expose Hydraulics to punitive damages liability, and the trial court did not err in so concluding.

**II. Appeal from Attorney Fees Order (Case Nos. B302722 & B302723)**

In appeal Nos. B302722 and B302723, both parties challenge the amount of attorney fees the trial court awarded Monterroso. Under the lodestar method for calculating attorney fees established in *Serrano v. Priest* (1977) 20 Cal.3d 25 (*Serrano*), the court begins *38* by "careful[ly] compil[ing] . . . the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case." (*Id.* at p. 48.) The court uses the resulting figure-the lodestar amount-as "a touchstone." (*Id.* at p. 49.) The lodestar amount reflects "the basic fee for comparable legal services in the community" (*ibid.*), which the court may then increase or decrease based on various factors, including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award. [Citation.] The purpose of such adjustment is to fix a fee at the fair market value for the particular action." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).)

Hydraulics challenges the fee award amount on the basis that the lodestar amount Monterroso requested was excessive. Monterroso challenges the trial court's refusal to employ a multiplier to the requested lodestar amount. Our review of these issues is for an abuse of discretion. (See, e.g., *Greene v. Dillingham Construction N.A., Inc.* (2002) 101 Cal.App.4th 418, 422 [FEHA attorney fee award].) Because "[t]he 'experienced trial judge is the best judge of the value of professional services rendered in his court,'" the trial court has substantial discretion in calculating the amount of attorney fees, and its decision in this regard" 'will

Monterroso v. Hydraulics Int'l, No. B299946 (Cal. Ct. App. Jan. 4, 2022)

not be disturbed unless the appellate court is convinced that it is clearly wrong.'" (*Serrano, supra,* 20 Cal.3d at p. 49.)

### A. *Whether the Attorney Fee Award Was Excessive*

To support the calculation of his requested lodestar figure $692, 616, Monterroso offered declarations from his attorneys describing what work they performed and why, the rates charged, and attesting to their rates having been previously approved by *39 courts on multiple occasions. Monterroso's supporting evidence also included declarations of comparable plaintiff-side attorneys in the employment law community attesting to courts having awarded them similar rates, evidence of rates received by defense-side employment attorneys, and contemporaneous billing records with descriptions of the work performed on Monterroso's case.[7] The court did not indicate what hour and rate amounts it utilized in arriving at the $625, 000 fee amount it ultimately awarded. The record strongly suggests, however, that the court utilized the rate and number of hours provided by Monterroso, given how close the fee award was to the lodestar amount Monterroso calculated, and that the court indicated it did not apply a multiplier.

> [7] Hydraulics did not include the compendium of evidence supporting Monterroso's fee request in the initial record filed on appeal. After Monterroso noted this in his respondent's brief, Hydraulics filed a supplemental appellant's appendix that included this evidence, as well as other documentation and briefing from the proceedings below, most of which Monterroso already had in his possession. Monterroso moved to strike the supplemental appendix. We deny the motion.

Hydraulics argues the hourly fees Monterroso used to calculate its fee request were excessive. Assuming the court used these rates in calculating the award amount, Hydraulics cites no evidence to support the conclusion that they are so excessive as to render that amount an abuse of discretion. In arguing to the contrary, Hydraulics relies on purported median hourly rates for Los Angeles area lawyers handling discrimination claims contained in a survey of which this court declined to take judicial notice.[8] *40 Hydraulics also relies on anecdotal references to the rates charged by its own attorneys on this case, as well as rates previously approved for Monterroso's attorneys in other cases, as reflected in unpublished cases of which we declined to take judicial notice. Particularly given the extensive evidence in the record attesting to the reasonableness of Monterroso's attorneys' rates-including evidence, properly within the record below and on appeal, that courts have approved similar rates for Monterroso's attorneys in other cases-Hydraulics has failed to meet its burden of establishing that use of these rates to calculate the fee award (assuming the court did so) constitutes an abuse of the court's broad discretion as" 'the best judge of the value of professional services rendered in his court.'" (*Serrano, supra,* 20 Cal.3d at p. 49.)

> [8] Hydraulics requested the trial court take judicial notice of this document as well. The record does not contain the trial court's ruling. Because there would be no need for Hydraulics to ask this court to take judicial notice of the survey, had the trial court already done so, we assume the trial court declined to take judicial notice of this document as well. Even if this survey were part of the record on appeal, however, it would not change the outcome of our analysis, as the trial judge has broad discretion as to the value of attorney services rendered in her courtroom, and, as outlined above, Monterroso offered multiple types of evidence to support the reasonableness of the requested rates. Hydraulics offers no basis on which the court should have believed the proffered survey instead of the attorney declarations and evidence of previous awards.

Hydraulics next challenges the amount of the fee award based on the number of hours included in Monterroso's fee request, which the trial court did not indicate it had reduced in calculating the award. Monterroso offered billing records and attorney declarations to support the reasonableness of the hours reflected in his lodestar calculation. Hydraulics's only criticism of this evidence as a basis for the fee award is that one attorney utilized block billing descriptions regarding his work opposing Hydraulics's motion for *41 summary judgment. Where the circumstances of the case require the trial court to deduct from a fee request work the attorneys performed on certain claims, block billing may be insufficient to support the request. Hydraulics argues such apportionment was necessary here, and that the fee award was excessive, because the court did not reduce the award to account for hours Monterroso's attorneys spent opposing Hydraulics's successful summary adjudication motion. We disagree.

A court may disallow fees on an unsuccessful claim if that claim is "distinct in all respects" from the successful claims (*Hensley v. Eckerhart* (1983) [461 U.S. 424, 440](#) (*Hensley*); accord, *Harman v. City and County of San Francisco* (2007) [158 Cal.App.4th 407, 423-424](#)), or" 'when a claimant achieves only limited success'" overall. (*Chavez v. City of Los Angeles* (2010) [47 Cal.4th 970, 989](#) (*Chavez*).) But a "fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." (*Hensley, supra*, [461 U.S. at p. 435](#); *Wysinger v. Automobile Club of Southern California* (2007) [157 Cal.App.4th 413, 430](#) (*Wysinger*) [same].)" '[W]here a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised.'" (*Id.* at p. 431.) Put differently, "fees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims." (*Chavez, supra*, [47 Cal.4th at p. 989](#).)

All of Monterroso's causes of action were based on the same conduct. As in *Wysinger*, each cause of action was "based on . . . paragraphs of facts in [the plaintiff's] complaint, which [the plaintiff] alleged were common to all causes of action." (*Wysinger, supra*, [157 Cal.App.4th at p. 431](#) [plaintiff prevailed on only two of eight causes of action but was still awarded full attorney fees].)

*42 Indeed, "employment discrimination cases, by their very nature, involve several causes of action arising from the same set of facts." (*Brown v. Superior Court* (1984) [37 Cal.3d 477, 486](#).) Nor did Hydraulics's summary adjudication victories meaningfully limit Monterroso's ultimate success at trial. To the contrary, Monterroso obtained what Hydraulics acknowledges was a substantial damages award, which Hydraulics thus can hardly characterize as "modest" success. (*Chavez, supra*, [47 Cal.4th at p. 990](#); *id.* at pp. 989-990 [reducing attorney fee award where success was "modest at best"].)

The trial court thus did not err in declining to apportion fees between Monterroso's various causes of action, and did not award an amount of attorney fees that exceeded the scope of the court's discretion.

## B. Court's Denial of Requested Multiplier

At the hearing on Monterroso's attorney fees request, Monterroso asked the court to increase its lodestar amount by a multiplier of two, based primarily on the complexity of the litigation and the contingent nature of the fee arrangement with Monterroso. In response, the trial court acknowledged the risk an attorney takes on in a contingency fee arrangement, stating: "I do note that you take . . . [cases] not on hourly fee. And you put your well-being at risk when you step in to represent an individual such as you did." The court further noted: "I have to tell you, I am not, in this instance, a fan of [l]odestar. But I am a fan of people getting reasonably compensated for their talent and their effort. The court is well aware that but for a trial lawyer willing to step up and take a

case like this, somebody like your client[ ] might not have had access to address their claims. I get it. What I think is reasonable might be different, but it is a substantial amount of money." *43 Without further discussion of its reasoning, the court denied Monterroso's request for a multiplier.

In determining whether to apply a multiplier to the lodestar based on contingent risk and difficulty, " [i]n effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Ketchum, supra,* 24 Cal.4th at p. 1132.) The framework thus does not require application of a multiplier any time there is a contingency fee involved; rather, such a multiplier is appropriate when the risk created by that fee "justif[ies]" adjustment of the lodestar amount. (*Ibid.*) As our state Supreme Court has explained, "the trial court is not required to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors" and in fact "should not consider these factors to the extent they are already encompassed within the lodestar." (*Id.* at p. 1138, italics omitted.) Thus, although the "contingent and deferred nature of the fee award in a . . . case with statutory attorney fees requires that the fee be adjusted *in some manner* to reflect . . . the fair market value of legal services provided," this "contingency adjustment may be made at the lodestar phase of the court's calculation *or* by applying a multiplier to the noncontingency lodestar calculation (but not both)." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.4th 359, 394-395, italics added.)

Monterroso argues that the trial court abused its discretion by denying the requested multiplier, because without it, Monterroso's attorneys will not be compensated for the risk they took on in accepting a contingency fee arrangement, and thus for the work they performed. (See *Ketchum, supra,* 24 Cal.4th at pp. 1122, 1138; *id.* at p. 1133

43

["fee awards should be fully *44 compensatory" and full compensation can include compensation for risk of nonpayment].) But just because the court did not grant a multiplier does not mean the court failed to include in its fee award "a premium for the risk of nonpayment." (*Id.* at p. 1138.) The court did not identify which hourly rates it used to calculate the award, or how it chose those rates. The award thus could have been based on rates the court determined sufficiently compensated Monterroso's attorneys for the risk of nonpayment the court acknowledged existed. The trial court's failure to expressly so state is not error; a trial court "has no sua sponte duty to make specific factual findings explaining its calculation of [a] fee award." (*California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 754 (*Duffy*); *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 67 [no California law requiring "trial courts to explain their decisions on all motions for attorney fees and costs, or even requiring an express acknowledgment of the lodestar amount"].) When a trial court's ruling on attorney fees does not identify the manner in which it calculated the fee award, "it is incumbent on the party who is dissatisfied with the court's calculation of the number of allowable hours to request specific findings." (*Duffy, supra,* 200 Cal.App.3d at p. 755.) But Monterroso did not request that the trial court specify how it arrived at the $625, 000 in fees. "California courts have stated a disinclination to review the amount of an award when specific findings were not requested." (*Ibid.*) To the contrary, "the appellate courts will infer all findings exist to support the trial court's determination." (*Id.* at p. 754.)

Accordingly, we infer that the court found the rates used in calculating the $625, 000 fee amount incorporated a contingency fee adjustment. Monterroso has failed to make a showing suggesting otherwise, and has failed to establish an abuse of *45 discretion. (See *Ketchum, supra,* 24 Cal.4th at pp. 1140-1141 [although record did not indicate whether trial court had employed the

lodestar method, appellant's claim that attorney fees award was wrongly calculated must be resolved against him, because appellant had failed to request and furnish an adequate record of the trial court's reasoning].)

**DISPOSITION**

Accordingly, we reverse the judgment against Hydraulics to the extent it finds Hydraulics liable under the FEHA for a failure to engage in an interactive process with Monterroso. In all other respects, including specifically the damages amount awarded, we affirm the judgment. We affirm the order awarding attorney fees in all respects. The parties shall bear their own costs on appeal.

46   We concur: CHANEY, J., CRANDALL, J. [*]  *46

[*] Judge of the San Luis Obispo Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


casetext

Filed 12/8/21  Herron v. County of L.A. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| JAMES HERRON,<br><br>        Appellant,<br><br>    v.<br><br>COUNTY OF LOS ANGELES,<br><br>        Respondent. | B295184<br><br>(Los Angeles County<br>Super. Ct. No. BC659323) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Fahey, Judge.  Affirmed in part and reversed in part.

        Lucien Law Group and Darryl M. Lucien, Pine Tillett Pine and Norman Pine, Law Office of Maximilian Lee and Maximilian Lee, for Appellant.

        Collins Collins Muir & Stewart, Tomas A. Guterres and Christian E. Foy Nagy, for Respondent.

_____

**INTRODUCTION**

James Herron sued the County of Los Angeles for five causes of action and over $2 million in damages.  A jury found for Herron on only two claims and awarded him a total of $200,000.  Herron moved for over $2.1 million in attorney fees and $121,000 in costs from the County under Government Code section 12965, subdivision (b) (section 12965(b)).  The court awarded Herron $320,000 in attorney fees and $28,472.58 in costs, and Herron appealed.

We affirm in part and reverse in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.     *The Parties and the Trial*

Herron was a temporary union employee for the County, working as a plumber.  After he injured his arm on the job, he was released back to the union.  Herron sued the County, alleging five causes of action: disability discrimination, failure to engage in the interactive process, failure to accommodate, failure to prevent disability discrimination and violation of the California Family Rights Act.

The matter proceeded to a bifurcated trial.  During the liability phase, the jury found in favor of Herron on the disability discrimination and failure to prevent discrimination claims and in favor of the County on the remaining three claims.  During the damages phase, Herron sought over $2 million in damages, but the jury awarded Herron $200,000: $180,000 for past economic loss and $20,000 for past non-economic loss.

B.     *The Motion for Attorney Fees and Motion To Tax Costs*

Herron moved for attorney fees and costs under section 12965(b).  Herron's attorneys, Darryl Lucien and Maximilian Lee, claimed that they worked 1635.7 and 232 hours, respectively, that

Lucien's hourly rate was $600 and Lee's hourly rate was $400 and that their combined lodestar amount was $1,074,220.  They requested a multiplier of 2.0, bringing their total attorney fee request to $2,148,440.  In his motion, Herron argued a multiplier was necessary given the novel issue presented (whether a temporary union hire for the County was considered an employee under the California Fair Employment and Housing Act (FEHA)), the skill displayed by his counsel, the employment opportunities his counsel had to forgo, the contingent nature of the fee award and the degree of success Herron achieved.  Herron also requested $121,465.58 in costs, including expert fees.  Herron supported his motion with a 20-page declaration by Lucien, a declaration by Lee and two declarations by plaintiff's employment attorneys, Genie Harrison and V. James DeSimone.[1]

In his declaration, Lucien said he worked as a certified law clerk for the Los Angeles County District Attorney's Office while in law school and conducted about 120 preliminary hearings and one misdemeanor trial.  He joined the California Bar in 2004 and has tried 15 jury trials since.  He has spoken at various legal seminars.  He was approved for an hourly rate of $467 in a court award of attorney fees in a prior case.  He increased his hourly rate to $600 after 14 years of practice based on his familiarity with the prevailing hourly rate in the community for work of a similar nature and complexity and based on independent research.

Regarding the number of hours spent on the case, Lucien said the case included 16 witness depositions, five expert depositions, 2,100 pages of deposition testimony, over 2,600 pages

---

[1]    Herron does not explicitly reference or appear to rely on the declarations by Lee, Harrison and DeSimone in his appellate briefs.

of documents, 1,500 emails and 11 ex parte motions.  Additionally, he contended it was difficult for Herron to disprove certain defenses asserted by the County according to a focus group poll. Further, Lucien said the County's defense tactics drove up the time and cost of the litigation.  Specifically, he said one of the County's attorneys, Ryan Chuman, produced the wrong witness for a deposition, objected throughout a deposition, instructed a witness not to answer questions in a deposition, took breaks during depositions, "coach[ed]" deponents on how to answer questions, unilaterally ended a deposition when a witness changed an answer and refused to produce necessary documents.  Lucien also said Chuman objected to depositions that Herron requested and refused to produce the deponents until the discovery cut-off date.

Regarding the request for a multiplier, Lucien said it was necessary to compensate for the contingent risk of the case and the amount of time he and Lee waited for compensation.  Lucien also said he displayed a high level of skill and achieved "a complete vindication of Mr. Herron's civil rights," which he said was an "exceptional result."  Plus, Lucien explained the trial court told counsel that the court estimated that Herron had a 50 percent chance of winning.  Additionally, Lucien said he and Lee are "true solo litigators who do not have any support staff" to assist them; they had to turn away other potential clients.  Lucien also said he proved the County had a "longstanding practice of discriminating against the disabled by terminating their employment, refusing to provide reasonable accommodations to temporary union hire employees, and refusing to engage in the interactive process."

The County opposed the motion, arguing that Herron was not the prevailing party and that the lodestar amount was unreasonable because Lucien's and Lee's hourly rates were

4

insufficiently supported and because their billings were inflated due to duplicative work and delays.  Specifically, the County sought to reduce billings associated with duplicative depositions, unsuccessful motions to compel and ex parte motions and communications between counsel.  The County challenged Lucien's hourly rate and argued that even if the court decided awarding fees was appropriate, Lucien should be awarded for no more than 800 hours at $400 an hour, with a downward multiplier of .5, making the total recovery $190,000 for Lucien and Lee.  The County also argued that Herron's limited success warranted a downward multiplier.  Plus, the County filed a motion to tax $113,596.70 in costs for Herron's allegedly excessive court filings, video depositions, duplicative depositions, expert fees, jury consultant fees and audio-visual technology.

The County submitted a 16-page declaration by Chuman, saying the case was overlitigated due to excessive and meritless motions and repetitive and duplicative depositions.

Regarding motions, Chuman said Herron brought eight ex parte motions, but only one was successful.  One motion was taken off calendar because Lucien had failed to meet and confer properly, and another was denied for failure to show good cause or an emergency existed.  For two motions, Lucien had provided a large volume of documents to the court without any direction as to where the court could find evidence that good cause existed within the exhibits.  Three ex parte appearances were noticed and canceled the morning of the hearing, one just 20 minutes before the hearing.

Regarding depositions, Chuman said the case was delayed because Lucien waited over five months after he knew about a percipient witness to notice the first percipient witness deposition. Lucien asked repetitive questions during depositions.  Lucien's

inflexibility and unwillingness to accommodate witnesses made certain depositions longer than necessary.  Four depositions took longer than one day to complete.  For example, Deputy Esmeralda Lopez testified that she had no personal knowledge of the reasons behind Herron's release and that she never worked with or knew Herron.  But Lucien still spent two days deposing her.  Lucien asked Lopez twice to "review a binder filled with over 300 documents to see if she could identify if one document that was previously produced was within that production."  Lucien was frustrated when Lopez provided the same response, and he suspended the deposition after an hour and a half and scheduled another day for deposition.  Another example was when Herron's deposition notice for the person most knowledgeable regarding the County's Responses to Special Interrogatories Set One did not identify what issues he intended to cover with the witness.  Chuman brought Craig Castanon, a "key witness."  But Lucien said he wanted somebody who "could testify as to how Deputy Esmeralda Lopez acquired information to respond to Plaintiff's Special Interrogatories (Set l) as opposed to an individual, such as Craig Castanon, who could testify as to the factual substance of the responses."  Instead of deposing Castanon, Herron suspended the deposition and postponed the deposition of another "person most knowledgeable" the following day.  Chuman offered several dates to reschedule both, but none were acceptable to Lucien.  Chuman proposed another set of dates and did not receive a response from Lucien.

According to Chuman, Lucien did not try to resolve discovery disputes.  Chuman said Lucien unilaterally set deposition dates.  When the County objected because the witnesses were not available during the requested times, and the County offered alternative dates, Lucien said he would move ex parte to compel

attendance at depositions.  Lucien was unwilling to provide dates for Herron's deposition, forcing Chuman to file an ex parte motion, which the court granted.

C.     *The Hearing*

During the motion hearing, the trial court questioned Lucien's requested hourly rate.  Lucien acknowledged that no judge had approved his requested $600 hourly rate.  The court explained it has "reviewed probably a hundred plus attorney's fee motions," and it usually sees Lucien's requested rate from lawyers at "the fairly big firms, perhaps different law schools, order of the coif, editor of law reviews, clerk for a federal judge, that kind of resume, which [the court] [does not] see here."  The court noted, "I'm very sensitive to hourly rates that are selected by counsel when [they] don't have that kind of background and really no empirical data to support it."  The court said in its experience, attorneys "who went to Harvard or Yale typically are paid at a much higher level" than those who went to other law schools because "it reflects, perhaps, an intelligence level beyond this court's intelligence level and a dedication and a drive and a capability that [the court] [does not] otherwise see with some other lawyers."  The court concluded that "background, experience, number of years, approval by judges of those hourly rates, et cetera" are all "factors that [the] court has in mind."

Then, the court addressed the request for a multiplier, asking whether "a multiplier is only for cases of exceptional result or novel or complex issues?"  Lucien explained that there are more factors the court must consider, including "the fact that the attorneys will not get paid for their work and the delay in payment."  The court noted, "here, there was no exceptional

result," since the damages award was only 10 percent of what Herron asked for.

Next, the court addressed the total number of hours claimed, saying, "One of the things that struck me throughout the time period that this case was pending is that it was overlitigated."  The court noted that Herron filed ex parte motions "on discovery issues that [the court] thought should have been properly resolved between a respectful and professional counsel."  The court reiterated its belief that "a lot of the hours expended here and efforts that [Herron] put in, [were] as if this was some sort of a federal class action lawsuit involving multiple parties and players, it was just, to sum it up, . . . overly litigated."

The court explained, "I think there were unnecessary depositions.  There are multiple dates of depositions.  There was unnecessary ex parte litigation. . . .  This is a fairly straightforward wrongful termination case. . . .  Rarely have I seen a case litigated to this extent."  Specifically, the court noted, "There seems to have been a number of examples in the record of [Herron's attorneys] coming close to badgering witnesses when witnesses did not respond in the fashion that you believed that they should respond."  The court, "[h]aving presided over thousands of cases over 20 years," noted that "it's very rare and generally unnecessary to have a deposition go longer than the statutory time limit or more than one day."

Finally, the court addressed the request for expert fees, saying, "[t]he experts were not court ordered[,] [s]o the expert witness fees are likely to be taxed."  The court asked, "Doesn't the Code [of Civil Procedure] say [the experts] have to be experts ordered by the order?"  Herron answered that the court has discretion to award expert fees in this case under section 12965(b). The Court replied, "So that's—This court has to make a

determination—in other words, you don't get it as a matter of right.  This court has to exercise its independent judgment, having presided over the case, as to whether or not those expert's fees were reasonable and necessary.  We agree on that, apparently."

D.    *The Court's Order*

The court filed its order one week after the hearing.  The court awarded Herron $320,000 in attorney fees and $28,472.58 in costs.

The court began by explaining it "seriously considered whether to award attorneys fees at all to plaintiff. . . .  This is not only because plaintiff prevailed on only two claims and received just about 10 percent of the amount he sought from the jury, but because plaintiff's counsel grossly over-litigated this case prior to trial."  The court found Chuman's declaration "accurately summarizes plaintiff's counsel's actions with respect to discovery abuses, including deposition conduct and unnecessary delays."  The court wrote, "having presided over multiple unnecessary discovery disputes, the Court [gave] little weight to Lucien's version of events."  The court noted Herron's counsel "waited some nine months after the case was filed to even notice the depositions of defendant's five key witnesses, and this was only after defendant had filed a motion for summary judgment."  The court also noted Herron's counsel "brought eight ex parte applications, seven of which were entirely denied and one which was mostly denied."  The court also found "[t]he excessive nature of the attorneys' fee demand also reflects adversely on the credibility of plaintiff's counsel's claims."

The court approved Lee's requested rate of $400 per hour.  But the court reduced Lucien's rate from $600 to $500 because attorneys with similar backgrounds and trial experience had been

approved for $400-$550 per hour and because of Lucien's pretrial and trial skills.  Specifically, the court noted "no judge has ever approved this [$600] rate" for Lucien.  The court drew on its experience reviewing over 100 fee motions over 15 years, which made the court familiar with the reasonable hourly rates of attorneys, ranging from solo practitioners to those from national law firms.  The court also noted it had "seen and approved hourly rates of $400-550 for attorneys with Lucien's background and trial experience."  The court found, "Given Lucien's pre-trial and trial skills . . . a rate of $500/hour is reasonable."

Then, the court reduced the hours from 2076 to 700 because the court found that Herron achieved limited success, overlitigated the case before trial and padded the hours.  Specifically, the court commented the requested hours are "grossly excessive for this relatively straightforward employment case."  The court explained its view that the hours were excessive by comparing Herron's case to a recent employment case the court presided over that was "much more difficult," where the jury awarded a $1.8 million verdict.  There, the lead attorney, who was "one of the most experienced, well-known and successful in California," only billed 228 hours, with the junior attorney billing 584 hours, for a total of 812.  The court found, "[A] reasonable number of hours for lead attorney Lucien should be no more than 400, and for the second chair Lee, 300."

Next, the court denied Herron's request for an upward multiplier because it found the case was not difficult or complex, the amount at issue was modest, the jury award was at the low end of verdicts and the attorney's rates compensated them for their contingency risk and skill.  Specifically, the court explained, "Plaintiff has not carried his burden."  "This was a run-of-the-mill

10

employment case[2] which had no difficult or complex issues. . . .
Further, the amount at issue was modest when compared to other
employment cases over which this Court has presided.  Plaintiff's
lawyers were competent, but not highly skilled.  And the result
obtained was also at the low end of jury verdicts in Los Angeles.
Finally, the market rate of plaintiff's attorneys adequately
compensates for their contingency risk and skill."  The court also
denied the County's request for a downward multiplier.

---

[2]     Before the closing argument on liability and outside the
presence of the jury, the court said, "The very narrow issue of
whether somebody hired as a union hall temporary employee was
entitled to accommodations, interactive process and leave.  I think
that's a very interesting narrow question.  [¶]  And I can see why
the County has vigorously defended this, because it probably has
very broad public policy implications for maybe hundreds, if not
thousands of hires."  The court also said, "I think this may be a
case of first impression, whether or not a union temp such as Mr.
Herron is an employee."

       However, the court changed its mind over three months,
during which it presided over the damages trial, jury instructions,
closing arguments and jury verdicts on both liability and damages
and briefing on the motion for attorney fees.  During the hearing
on the motion for attorney fees, the court admonished Herron for
attempting to frame his case as having broad policy implications.
When Herron tried to frame the case as being about "the Los
Angeles County pattern and practice, and their policy of not
providing reasonable accommodations [or] interactive process," the
trial court interrupted and explained, "Actually, it wasn't at all.
And [the court] admonished you in front of the jury when you
attempted to expand the nature of this litigation beyond your
clients to some policy and to send a message, et cetera.  This case
was about one individual who alleged he was wrongfully
terminated.  [The court] cannot agree with your characterization."

11

Finally, the court reduced Herron's requested costs from over $121,000 to $28,472.58. Among the costs cut, the court denied Herron's request for expert fees. Specifically, "[P]laintiff is not entitled to be reimbursed for experts not ordered by the court . . . . The trial court also has the discretion to disallow costs for items which are only a convenience or beneficial, as opposed to necessary, for trial preparation." The court denied "expert witness costs in the amount of $34,325."

## DISCUSSION

Herron argues the trial court abused its discretion by reducing Lucien's hourly rate to calculate the lodestar, by reducing the total attorney hours to calculate the lodestar, by not applying an upward multiplier to the lodestar and by not awarding expert costs.

We agree with Herron on expert costs but disagree with him on attorney fees.

A.    *Section 12965(b)*

FEHA, governed by Government Code section 12900 et seq., was enacted to "safeguard the rights of all persons to seek, obtain, and hold employment without discrimination on account of various characteristics, which now include race, religion, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, and sexual orientation." (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 984 (*Chavez*).)

Under section 12965(b), a party may bring a civil action for damages resulting from violations of FEHA and seek attorney fees and costs: "In civil actions brought under this section, the court, in its discretion, may award to the prevailing party, including the department, reasonable attorney's fees and costs, including expert

12

witness fees." This statute creates an asymmetrical standard for awarding fees and costs: While "a prevailing plaintiff should ordinarily receive his or her costs and attorney fees unless special circumstances would render such an award unjust[,] . . . [a] prevailing defendant, however, should not be awarded fees and costs unless the court finds the action was objectively without foundation when brought, or the plaintiff continued to litigate after it clearly became so." (*Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 105 (*Williams*), italics and citation omitted.)

  1. *Attorney Fees*

  "In deciding whether to, and how to, award fees under [Government Code] section 12965, subdivision (b), courts will look to the rules set forth in cases interpreting [Code of Civil Procedure] section 1021.5." (*Chavez*, *supra*, 47 Cal.4th at p. 985.) "Under Code of Civil Procedure section 1021.5, if a court determines that attorney fees should be awarded, computation of those fees is based on the lodestar adjustment method as set forth in *Serrano v. Priest* (1977) 20 Cal.3d 25 [(*Serrano*)]." (*Ibid.*) The lodestar is determined by multiplying a reasonable rate for each attorney by a reasonable number of hours worked by that attorney. (*Ibid.*) The lodestar may then be "adjusted upward or downward" with an optional multiplier. (*Ibid.*)

  The moving party bears the burden "to persuade the trial court the work was reasonably necessary, both as to the particular tasks performed and the amount of time devoted to them." (*Baxter v. Bock* (2016) 247 Cal.App.4th 775, 793 (*Baxter*); see *Roth v. Plikaytis* (2017) 15 Cal.App.5th 283, 290 [explaining the party seeking attorney fees "'"bear[s] the burden of establishing entitlement to an award and documenting the appropriate hours

expended and hourly rates"'"].)  On the other hand, "[i]n challenging attorney fees as excessive because too many hours of work are claimed, it is the burden of the challenging party to point to the specific items challenged, with a sufficient argument and citations to the evidence.  General arguments that fees claimed are excessive, duplicative, or unrelated do not suffice."  (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564.)

"In FEHA actions, attorney fee awards, which make it easier for plaintiffs of limited means to pursue meritorious claims [citation], 'are intended to provide "fair compensation to the attorneys involved in the litigation at hand and encourage [ ] litigation of claims that in the public interest merit litigation."'" (*Chavez*, *supra*, 47 Cal.4th at p. 984.)  However, "the ultimate goal is 'to determine a "reasonable" attorney fee, and not to encourage unnecessary litigation of claims that serve no public purpose either because they have no broad public impact or because they are factually or legally weak.'"  (*Id.* at p. 985.)

  2.  *Costs*

Under Civil Code section 1032, subdivision (b), "a prevailing party is entitled as a matter of right to recover costs in any action or proceeding," unless specified otherwise by statute.

Under Government Code section 12965, subdivision (b), a trial court has the discretion to award the prevailing party reasonable costs, including expert witness fees.  But a prevailing defendant "shall not be awarded fees and costs unless the court finds the action was frivolous, unreasonable, or groundless when brought, or the plaintiff continued to litigate after it clearly became so."  "By making a cost award discretionary rather than mandatory, Government Code section 12965 expressly excepts

FEHA actions from Code of Civil Procedure section 1032's mandate for a cost award to the prevailing party." (*Williams*, *supra*, 61 Cal.4th at p. 114.)  "'[T]rial courts have a duty to determine whether a cost is reasonable in need and amount.'" (*Acosta v. SI Corp.* (2005) 129 Cal.App.4th 1370, 1380 (*Acosta*).)

Because the court has discretion to award or deny costs in a FEHA case, a prevailing party must move for costs just as it would attorney fees.  (See *Anthony v. City of Los Angeles* (2008) 166 Cal.App.4th 1011, 1016.)

B.   *Standard of Review*

1.   *Attorney Fees*

We review an attorney fee award for abuse of discretion. (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488.)  In reviewing the award, we are guided by well-established principles. "[T]he awarding of attorney fees and the calculation of attorney fee enhancements are highly fact specific matters best left to the discretion of the trial court."  (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 581.)  "The '"experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'"  (*Ketchum v.* Moses (2001) 24 Cal.4th 1122, 1133 (*Ketchum*).)  "An appellate court will interfere with the trial court's determination of the amount of reasonable attorney fees only where there has been a manifest abuse of discretion."[3]

---

[3]    Herron claims the abuse of discretion standard applicable in an attorney fee appeal requires stricter scrutiny than the normal abuse of discretion standard based on a sentence in *Horsford v. Board of Trustees of California State University* (2005) 132

15

(*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1004 (*Heritage*).)

"We review any factual findings by the trial court in connection with the ruling under the substantial evidence standard."  (*Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 981.)

### 2.    *Costs*

"Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion."  (*Acosta*, *supra*, 129 Cal.App.4th at p. 1380.)  "'Absent an explicit statement by the trial court to the contrary, it is presumed the court properly exercised its legal duty.'"  (*Ibid.*)

Whether a court applied the proper criteria for a cost award is a question of law reviewed de novo: "'"[D]e novo review of such a trial court order is warranted where the determination of whether the criteria for an award of . . . costs in this context have been satisfied amounts to statutory construction and a question of law."'"  (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751.)

---

Cal.App.4th 359, 393 (*Horsford*): "[A] reasoned decision based on the reasonable view of the scope of discretion is still an abuse of judicial discretion when it starts from a mistaken premise."  But *Horsford* did not increase the scrutiny of attorney fee orders.  *Horsford* merely stated the abuse of discretion standard in a different way.  (See *Chavez*, *supra*, 47 Cal.4th at p. 989 [reviewing trial court's decision denying attorney fees in FEHA action for abuse of discretion].)

C.   *The Trial Court Did Not Abuse Its Discretion in Calculating the Attorney Fee Award*

    1.   *Rate*

        a.   *The trial court did not err in determining a reasonable rate for Lucien*

The reasonable hourly rate of an attorney depends on several factors, including "the level of skill necessary, time limitations, the amount to be obtained in the litigation, the attorney's reputation, and the undesirability of the case." (*Ketchum*, *supra*, 24 Cal.4th at p. 1139.) "The court may rely on its own knowledge and familiarity with the legal market in setting a reasonable hourly rate." (*Heritage*, *supra*, 215 Cal.App.4th at p. 1009.)

The trial court found "a rate of $500/hour is reasonable" for Lucien. The court reduced Lucien's rate from the $600 he requested because of his "pre-trial and trial skills" and because the court had "seen and approved hourly rates of $400-550 for attorneys with Lucien's background and trial experience." In determining $500 per hour was a reasonable rate for Lucien, the court noted, "no judge has ever approved [Lucien's $600] rate." The court reviewed Lucien's education, trial experience, practice and accomplishments. The court explained, "Lucien is a sole practitioner," "[h]e graduated from Glendale University College in 2002," he has tried "one misdemeanor trial while a clerk with the District Attorney's office and 15 civil trials," and "[h]e has spoken at three CLE seminars." The court compared Lucien's background and trial experience against that of other attorneys in the legal market. The court knew the legal market because it had reviewed over 100 fee motions in over 15 years, from solo practitioners to those working at national law firms. The court saw Lucien's pretrial and trial skills when the court presided over the case.

The factors the court relied on were proper.  (See, e.g., *Stratton v. Beck* (2017) 9 Cal.App.5th 483, 496 [finding no abuse of discretion in court setting attorney's hourly rate based on comparison of rates from similarly experienced attorneys in same field and area]; *Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 783 [affirming award where "the hourly rates allowed by the trial court are within the range of reasonable rates charged by and judicially awarded comparable attorneys for comparable work"].)

> b.   *Herron's argument to the contrary is unpersuasive*

Herron argues the trial court reduced Lucien's hourly rate based on his intelligence level and dedication because at the hearing, the court said, in its experience, attorneys "who went to Harvard or Yale typically are paid at a much higher level" than those who went to other law schools, because "it reflects, perhaps, an intelligence level beyond this court's intelligence level and a dedication and a drive and a capability that [the court] [does not] otherwise see with some other lawyers."  But Herron takes the court's comment out of context.  The court was comparing Lucien's background and experience with other attorneys in the legal market as it was allowed to do.  The court explained, "[B]ackground, experience, number of years, approval by judges of those hourly rates, et cetera.  All of those are factors that this court has in mind."

2.    *Hours*

    a.    *The trial court did not err in determining a reasonable number of hours for Herron's attorneys*

"[A]bsent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for all the hours reasonably spent, including those relating solely to the fee." (*Ketchum*, *supra*, 24 Cal.4th at p. 1133.)  "'Reasonably spent' means that time spent 'in the form of inefficient or duplicative efforts is not subject to compensation.'" (*Horsford*, *supra*, 132 Cal.App.4th at p. 394.)

    The trial court found "a reasonable number of hours for lead attorney Lucien should be no more than 400, and for second chair Lee, 300."  The court reduced the total hours to 700 from the 2,076 Herron's counsel requested because the court found that Herron "grossly over-litigated this case prior to trial," that "the bills were padded," and that Herron achieved limited success.

    First, overlitigation or "'"padding" in the form of inefficient or duplicative efforts is not subject to compensation.'" (*Ketchum*, *supra*, 24 Cal.4th at p. 1132.)  The trial court's finding that Herron overlitigated the case is supported by substantial evidence, including the declaration by Chuman and the court's observations from presiding over the case.  In his declaration, Chuman said that almost all of Herron's ex parte motions were meritless, that some of Herron's depositions were unnecessary and long and that Herron did not try to resolve discovery disputes.  The court agreed with Chuman: "Chuman accurately summarized plaintiff's counsel's actions with respect to discovery abuses, including deposition conduct and unnecessary delays."  The court gave "little weight to Lucien's version of the facts" because it had "presided over multiple unnecessary disputes."  According to the court,

Herron's "counsel brought eight ex parte applications, seven of which were entirely denied and one which was mostly denied." Herron claims he received relief on four of his eight ex parte applications.  By our calculation based on the appellate record, Herron filed six ex parte applications, with only one application granted and another granted in part.  But no matter what, the trial court's point still stands: Herron filed several meritless ex parte motions.

Although the trial court awarded Herron attorney fees for fewer hours than requested, we do not find the court abused its discretion based on the record before us.  Having presided over the entire case, including discovery disputes, the experienced court was well-positioned to determine if Herron's attorneys overlitigated or padded their hours.  (See *Baxter*, *supra*, 247 Cal.App.4th at p. 794 ["The experienced trial judge, who presided over the entire proceeding, was able to observe the parties' tactics and evaluate the appropriate amount of time and effort required.  While we recognize the court awarded compensation for considerably less time than was actually expended, we are not in a position to second-guess its determination of reasonable necessity, let alone to declare its judgment 'clearly wrong' [citation] or beyond 'the bounds of reason.'"].)

Second, "[a] fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether." (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 635 (*Serrano II*).)  The trial court was in the best position to determine if Herron's requested hours were inflated. (See *Baxter*, *supra*, 247 Cal.App.4th at p. 794.)  The court explained that it had experience reviewing over 100 fee motions in more than 15 years and that the hours claimed by Herron were

"grossly excessive for this relatively straightforward employment case."

Finally, a court can reduce an attorney fee award if a prevailing party obtained limited success under *Hensley v. Eckerhart* (1983) 461 U.S. 424, 436, superseded, in part on other grounds, by the Prison Litigation Reform Act (*Hensley*).[4]  (See also *Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 248 [explaining "the degree or extent of appellants' success in obtaining the results which they sought must be taken into consideration in determining the extent of attorney fees which it would be *reasonable* for them to recover"].)  In cases involving limited success, California courts have adopted a two-step framework.  (*Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 238 (*Environmental Protection*).)

In the first step, a court must answer the question:  Did "the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?"  (*Hensley*, *supra*, 461 U.S. at p. 434.)  Claims are related if their attorney fees are intertwined.  (See *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 424 ["Where the court considered the fees intertwined, the successful and unsuccessful claims were found related, as *Hensley* directs."].)

If the successful and unsuccessful claims are related, in the second step, the court must answer the question: "[D]id the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"

---

[4]     In interpreting and applying FEHA's attorney fee provisions, California courts have looked to federal decisions involving Title VII fees for guidance.  (See *Chavez*, *supra*, 47 Cal.4th at p. 985.)

(*Hensley*, *supra*, 461 U.S. at p. 434.)  In the second step, the court "focus[es] on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."  (*Ibid*.)  In a case of limited success, "the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount."  (*Id*. at p. 436.)  The court's calculation "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success."  (*Id*. at pp. 436-437.)

Here, the court applied both steps of the *Hensley* test correctly.  For the first step, it is uncontroverted that Herron's successful and unsuccessful claims are related.  For the second step, in its order, the court found Herron did not achieve a level of success that justified the requested hours.  The court noted Herron "prevailed on only two claims," "received just about 10% of the amount he sought," and "the result obtained was also at the low end of jury verdicts in Los Angeles."  Plus, it appears Herron did not obtain any of the injunctive relief he sought, which included being reinstated to his prior position, requiring supervisors to undergo training relating to the treatment of disabled employees, and requiring the County to enforce policies in a non-discriminatory fashion.  (*Environmental Protection*, *supra*, 190 Cal.App.4th at p. 238 ["The trial court may reduce the amount of the fee award 'where a prevailing party plaintiff is actually unsuccessful with regard to certain objectives of its lawsuit.'"].)  As the court said during the hearing, "Here, there was no exceptional result."

> b.   *Herron's arguments to the contrary are*
>      *unpersuasive*

Herron argues that public policy and the purpose of FEHA cut against the trial court's decision to reduce his attorney fee award.  But "under the FEHA, the ultimate goal is 'to determine a "reasonable" attorney fee, and not to encourage unnecessary litigation of claims that serve no public purpose . . . because they have no broad public impact.'"  (*Chavez*, *supra*, 47 Cal.4th at p. 990.)  Herron cannot claim that his success on his two discrimination claims "had any broad public impact or resulted in significant benefit to anyone other than himself."  (*Ibid*.)

Herron claims, "Indeed, Mr. Herron's trial success has doubtless led the County to revisit its policy of denying employees like Mr. Herron FEHA's protections."  But he fails to substantiate this argument with record citations or any explanation.  (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)  He points to the trial court's comment that his case may have broad policy implications.  But he ignores that the court changed its mind several months later after overseeing numerous court proceedings, including the damages trial, jury instructions, closing arguments and jury verdicts on liability and damages, and the briefings on the motion for attorney fees.  In fact, at the motion hearing, the court disagreed with Herron's characterization of the litigation as a public policy case.  In the court's order, the court described the case as a run-of-the-mill employment case.

Herron takes issue with the court's consideration of the damages recovered at trial.[5]  While it is true that "attorney fees

_____

[5]     Herron also argued that he received almost all his damages: "Even if Mr. Herron had succeeded on all five of his causes of

need not be strictly proportionate to the damages recovered"
(*Chavez*, *supra*, 47 Cal.4th at p. 989), courts have routinely
considered the total amount recovered in determining whether to
reduce attorney fees.  In fact, the California Supreme Court in
*Chavez* affirmed a complete denial of attorney fees in a FEHA case
because the trial court found the requested hours were "grossly
inflated when considered in light of the single claim on which
plaintiff succeeded, the amount of damages awarded on that claim,
and the amount of time an attorney might reasonably expect to
spend in litigating such a claim."  (*Id.* at p. 991.)  Here, the court
similarly found that the hours were "grossly excessive," that
Herron succeeded on only two claims, that the jury awarded
Herron only 10 percent of the damages he sought and that only
700 of Herron's 2,076 requested hours were reasonable.[6]

---

action, he would have at most received nominally, two weeks more
damages . . . .  Hence, while it is true that Mr. Herron failed to
obtain relief in three of his five claims, this cannot be said to be
limited success because he nevertheless obtained complete relief
for his damages."  Not true.  Herron asked the jury for more than
$2 million in damages, but it only awarded him $200,000.

[6]      Herron relies on *Warren v. Kia Motors America, Inc.* (2018)
30 Cal.App.5th 24, 37, where the court wrote, if "the reasons for
the [fee] reduction include tying the fee award to some proportion
of the buyer's damages recovery, the court abuses its discretion."
But the court prefaced this statement with, "when a trial court
applies a substantial negative multiplier to a *presumptively
accurate lodestar* attorney fee amount, the court must clearly
explain its case-specific reasons for the percentage reduction."
(*Ibid.*, italics added.)  In this case, Herron's attorney fee recovery
was reduced because the court had a different view as to how
many hours were reasonably incurred, not because it reduced the
final lodestar attorney fee amount by a percentage.  Plus, the court

24

Herron complains about the trial court's comments, which he takes out of context.  He argues because the court noted in its order that precedent "*mandates* a substantial reduction" of the attorney fee award, the court incorrectly believed it was *required* to reduce the fees based on limited success.  Not true.  Immediately after the quoted statement, the court acknowledged its discretion to decide not just the amount of attorney fees, but whether to award any at all, when it said, "this Court has seriously considered whether to award attorney fees at all to plaintiff."

Herron also takes out of context a comment the court made at the hearing: "Having presided over thousands of cases over 20 years, . . . it's very rare and generally unnecessary to have a deposition go longer than the statutory time limit or more than one day."  As Herron points out, the statutory time limit for depositions does not apply in employment cases.  (*Williams*, *supra*, 61 Cal.4th at p. 113, fn. 3.)  But the court was discussing its concern about how long the depositions took to complete overall; the court never said it was reducing Herron's hours based on a mistaken belief that a statutory time limit applied.

Herron argues that the County failed to adequately challenge his time entries and that the court failed to adequately explain its fee reduction.  But the County met its burden.  The County's motion argued that Herron's ex parte motions and conduct during discovery and depositions padded Herron's fees.  The County identified delayed depositions and ex parte motions and included a declaration by Chuman explaining the conduct in detail with exhibits of email exchanges between the parties'

---

here did not reduce its fee award by making it proportionate to the amount Herron recovered.

attorneys.  Likewise, the court sufficiently explained its grounds
for reducing Herron's attorney fees.  A "court may attempt to
identify specific hours that should be eliminated, or *it may simply
reduce the award to account for the limited success*."  (*Hensley*,
*supra*, 461 U.S. at pp. 437-438, italics added.)  And "[w]hen
confronted with hundreds of pages of legal bills, trial courts are
not required to identify each charge they find to be reasonable or
unreasonable, necessary or unnecessary. . . .  A reduced award
might be fully justified by a general observation that an attorney
overlitigated a case or submitted a padded bill or that the opposing
party has stated valid objections."  (*Gorman v. Tassajara
Development Corp.* (2009) 178 Cal.App.4th 44, 101.)  In its order,
the court explained it reduced Herron's hours because the court
found Herron achieved limited success, he overlitigated his case,
and the hours he requested were padded.

Herron also points out the County, in its opposition, stated
that Lucien should be awarded no more than 800 hours, which is
double the trial court's award.  First, such a statement does not
establish that the court abused its discretion because the court
itself is required to determine the number of hours reasonably
spent on the case.  Second, the County did not concede Lucien
reasonably expended 800 hours on the case.  The County
requested he be awarded no fees and fees for no more than 800
hours in the alternative.  Third, Lucien would have received less
money if the court had awarded Herron fees following the County's
recommendation.  That is because the County also suggested that
Lucien's hourly rate be set at $400 an hour and a downward
multiplier of 0.5 be applied, bringing Lucien's attorney fee award
to $160,000, which is $40,000 less than what the trial court
awarded.

Finally, Herron argues the court failed to consider how the court's errors accounted for Herron's limited success and "needlessly complicated the litigation." The errors he complains about concern two jury instructions that were given and another modified instruction that was not. But Herron never raised this instructional error argument during the briefing on attorney fees in the trial court. (*In re Campbell* (2017) 11 Cal.App.5th 742, 756 ["We will not address arguments raised for the first time on appeal."].) Even if the argument had been properly raised, Herron fails to explain how these alleged errors led the court to abuse its discretion during its fee award calculations.

    3.   *Multiplier*

        a.   *The trial court did not abuse its discretion in denying a multiplier*

After the lodestar figure has been calculated, a trial court may apply an optional upward multiplier to the lodestar figure based on several factors. (*Ketchum*, *supra*, 24 Cal.4th at p. 1138.) These factors include "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." (*Id.* at p. 1132.) "[T]he trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors, although it retains discretion to do so in the appropriate case; moreover, the party seeking a fee enhancement bears the burden of proof." (*Ibid.*) "'In reviewing a challenged award of attorney fees and costs, we presume that the trial court considered all appropriate factors in selecting a multiplier and applying it to the lodestar figure. [Citation.] This is in keeping with the overall review standard of abuse of discretion, which is found only where no

27

reasonable basis for the court's action can be shown.'" (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1249–1250.)

The trial court denied Herron's request for a multiplier because Herron had "not carried his burden in this regard." The court found that Herron's case was "a run-of-the-mill employment case which had no difficult or complex issues," that "the amount at issue was modest when compared to other employment cases over which th[e] Court has presided," that "the result obtained was also at the low end of jury verdicts in Los Angeles," that Herron's "lawyers were competent, but not highly skilled" and that "the market rate of plaintiff's attorneys adequately compensates for their contingency risk and skill." These were reasonable bases for denying the multiplier. (See *Ketchum*, *supra*, 24 Cal.4th at pp. 1138-1139 ["Of course, the trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors, although it retains discretion to do so in the appropriate case . . . . In each case, the trial court should consider . . . the degree to which the relevant market compensates for contingency risk, extraordinary skill, or other factors under *Serrano*[ ]. We emphasize that when determining the appropriate enhancement, a trial court should not consider these factors to the extent they are already encompassed within the lodestar."].)

> b.  *Herron's arguments to the contrary are unpersuasive*

Herron argues the court erred in not applying a multiplier because there is no extraordinary circumstance to warrant not using a multiplier and because the court failed to adequately account for the contingency risk. But "[a] fee request that appears

28

unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether."  (*Serrano II*, *supra*, 32 Cal.3d at p. 635.)  The trial court determined the fee request here was unreasonably inflated, meaning there was an extraordinary circumstance to warrant denying the award *entirely*. Plus, the court found the market rate for Herron's attorneys "adequately compensates for their contingency risk and skill."  As a result, applying a multiplier would have been an "unfair double counting" and "unreasonable."  (*Ketchum*, *supra*, 24 Cal.4th at p. 1139.)

Herron also points out that during the hearing, the court asked, "Isn't it true that a multiplier is only for cases of exceptional result or novel or complex issues," to suggest the court misunderstood the law as it relates to multipliers.  But the court's order, citing *Ketchum* and reviewing the relevant factors for a multiplier, dispels any concern that the court misunderstood the applicable law.

Lastly, Herron relies on the court's earlier comment that the case may have broad policy implications.  But he does not reconcile that comment with the court's later remarks after presiding over more of the litigation.  Specifically, the court found the case did not involve broad policy implications but rather was a simple employment case.

D.     *The Trial Court Erred in Denying Herron's Request for Expert Fees*

It appears the trial court did not understand it had the discretion to award Herron expert fees even if the expert was not court ordered.  In its order, the trial court denied Herron's request for expert fees because the "plaintiff is not entitled to be reimbursed for experts not ordered by the court" and "[t]he trial

court also has the discretion to disallow costs for items which are only a convenience or beneficial, as opposed to necessary, for trial preparation."  The court was referencing and cited a case concerning Code of Civil Procedure section 1033.5, subdivision (b)(1), which limits reimbursement of expert fees awarded under Code of Civil Procedure section 1032, subdivision (b), to fees for experts ordered by the court or otherwise expressly authorized by law.  But Herron did not seek costs under the Code of Civil Procedure, sections 1032 and 1033.5.  Instead, he sought costs under section 12965(b), which does not limit the reimbursement of expert fees to experts ordered by the court.

That the trial court may have acknowledged its discretion during oral argument is insufficient.  During the hearing, the trial court asked, "Doesn't the Code [of Civil Procedure] say [the experts] have to be experts ordered by the order?"  Lucien answered the court has discretion to award expert fees in this case under section 12965(b).  The court said, "This court has to exercise its independent judgment, having presided over the case, as to whether or not those expert's fees were reasonable and necessary.  We agree on that, apparently."  But "'a judge's comments in oral argument may never be used to impeach the final order, however valuable to illustrate the court's theory they might be under some circumstances.'"  (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300)  This is because "'[a]n oral ruling is subject to varying memories and may not be clear or specific. . . .  A court may change its ruling until such time as the ruling is reduced to writing and becomes the [final] order of the court.'"  (*Ibid.*)

The County argues Herron "has not shown *but for* the application of . . . section 12965(b), he would certainly have been awarded his expert witness fees" and has not shown how experts

improved his case.  The County misses the point.  The issue on appeal is not whether Herron met his burden of introducing sufficient evidence to justify being awarded expert fees.  Instead, the issue is whether the trial court understood it had the discretion to award expert fees irrespective of whether the expert was court ordered.

**DISPOSITION**

The attorney fee order under section 12965(b) is affirmed.  The cost award is reversed with directions to the trial court to award any expert fees the court finds reasonable.  Each party is to bear its costs on appeal.


IBARRA, J.*


We concur:


PERLUSS, P. J.


FEUER, J.

_____

*       Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 2/10/21  Ojeda v. Azulay CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALBINO OJEDA,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHELLE AZULAY et al.,<br><br>    Defendants and Appellants. | B302440<br><br>(Los Angeles County<br>Super. Ct. No. BC683391) |

    APPEAL from an order of the Superior Court of Los Angeles County, Michael L. Stern, Judge.  Affirmed as modified.

    Shaghzo & Shaghzo, Armen Shaghzo for Defendants and Appellants.

    No appearance for Plaintiff and Respondent.

————————————

Albino Ojeda prevailed against Michelle and Eric Azulay and 5000 Laurel Canyon Blvd., LLC (collectively Azulay) after a bench trial. The trial court entered judgment in Ojeda's favor, and the trial court then granted his motion for attorney fees. Azulay now contends that the motion should have been denied because it was untimely, and it requested unreasonable fees. We reduce the fee award but otherwise affirm the order as modified.

## BACKGROUND

Azulay employed Ojeda to be the resident manager of an apartment complex. Ojeda sued Azulay for violations of the Labor Code. The complaint alleged eight causes of action, but the trial court granted Azulay's motion for nonsuit as to five of them. The matter proceeded to a two-day bench trial on the remaining three causes of action concerning failure to pay wages. On May 31, 2019, the trial court found for Ojeda and awarded him $30,929.94 in damages plus interest. The trial court also found that Ojeda was entitled to costs and statutory attorney fees, to be determined by a noticed motion. The trial court entered judgment, and the clerk mailed notice of entry of judgment that same day.

Ojeda served his notice of motion and motion for attorney fees and costs on August 1, 2019. He asked for $126,161.25 in attorney fees based on a lodestar of $84,107.50 with a 1.5 multiplier, plus $4,910.99 in costs. The declaration of Ojeda's counsel accompanying the motion detailed counsel's legal background, experience, and the work performed on the case. That work included drafting the pleadings, attending court conferences, engaging in discovery, taking a deposition, preparing for and attending trial, and preparing closing memorandums per the trial court's request. Counsel spent 197.9 hours on the case

at an hourly rate of $425, as detailed by his time records. Further, he took the case on a contingency basis.

Azulay opposed the motion on the grounds that the motion was untimely and that the fees were unreasonable for a straightforward wage and hour case tried over just two days. Azulay also argued that Ojeda's counsel block billed for tasks that included administrative matters, that fees requested for two small claims matters defendants brought against Ojeda should be excluded, and that no multiplier should be applied. Azulay thus asked that the motion be denied or reduced by at least $27,755.

In his reply, Ojeda conceded that his motion was filed and served two days late but explained he had incorrectly interpreted the five-day rule in Code of Civil Procedure section 1013. He defended the reasonableness of the fees but admitted he had inappropriately included 1.3 hours spent reviewing and forwarding to his client the small claims actions.

An unreported hearing was held on Ojeda's motion at which Ojeda's counsel appeared but Azulay's did not. The trial court granted the motion for attorney fees in the lodestar amount of $84,107.50 and declined to apply a multiplier. As Azulay had already paid Ojeda's costs, the trial court issued no further award of costs.[1]

---

[1] On December 10, 2019, the trial court signed a second "judgment" with respect to the attorney fees award. (Boldface and capitalization omitted.)

3

# DISCUSSION

I.   Timeliness of the attorney fees motion

Azulay contends that the trial court should have denied the motion for attorney fees because it was untimely.  Because Azulay has not submitted a record adequate to evaluate this issue, we disagree.

Ojeda conceded below that he filed his motion for attorney fees two days late.  That is, a motion for attorney fees must be served and filed within the time for filing a notice of appeal, which generally is the earlier of 60 days after service of the notice of entry of judgment or 180 days after entry of judgment.  (Cal. Rules of Court, rules 3.1702(b)(1), 8.104(a)(1)(B), 8.108.)  However, the parties may stipulate to extend the time for filing the motion or, for good cause, the trial judge may extend it.  (Cal. Rules of Court, rule 3.1702(b)(2), (d)).  An honest mistake of law may constitute good cause for relief depending on the reasonableness of the misconception.  (*Robinson v. U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 327–328.)  We review a trial court's finding of good cause for an abuse of discretion, and a litigant challenging that finding has an "uphill battle."  (*Id.* at p. 326.)

Notwithstanding that the trial court here made no express finding of good cause, we cannot find any abuse of discretion on this record.  Rather, Azulay opposed the motion on the ground it was untimely, and Ojeda's counsel explained in his reply that he had misapplied Code of Civil Procedure section 1013 and asked the trial court to consider the motion.  Therefore, the issue was fully briefed in the trial court.  By hearing and granting the motion, the trial court impliedly accepted Ojeda's explanation and found good cause.  Azulay did not appear to argue the motion

4

and has otherwise failed to present evidence of what occurred at the hearing.

Given the standard of review—abuse of discretion—that failure is fatal to this issue.  We presume a judgment or order is correct and indulge all intendments and presumptions in favor of its correctness.  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Azulay, as appellant, bears the burden of affirmatively showing prejudicial error, and, to satisfy this burden, had to provide an adequate record to assess error.  (See, e.g., *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324.)  Where no reporter's transcript or settled statement has been provided and no error is apparent on the face of the existing appellate record, we presume that unreported matter would demonstrate the absence of error.  (Cal. Rules of Court, rules 8.130, 8.134, 8.137; see, e.g., *Estate of Fain* (1999) 75 Cal.App.4th 973, 992; *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.)

Good cause appears in the record based on counsel's honest mistake of law.  That being so and indulging all inferences in support of the trial court's order, we cannot rule out that the trial court found, in its discretion, good cause to consider the untimely motion.

II.    Reasonableness of attorney fees

Azulay next attacks the reasonableness of the fees on four grounds:  (1) the block billing includes impermissible administrative tasks, (2) fees incurred regarding small claims actions should have been excluded, (3) Ojeda prevailed on only three of eight causes of action, and (4) fees were three times the damages awarded.  Applying the applicable abuse of discretion

standard of review (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095), we address each in turn.

### A. *Block billing*

Turning to the first of Azulay's contentions, that Ojeda improperly block billed, block billing occurs when an attorney lists multiple tasks done in one day or over one period of time and does not specify the time spent on individual tasks.  (See generally *Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1010.)  Block billing is not per se objectionable. (*Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 830.) Rather, the amount of attorney fees to be awarded is left to the trial court's sound discretion (*Vella v. Hudgins* (1984) 151 Cal.App.3d 515, 522), and trial courts retain discretion to penalize block billing when it prevents distinguishing between compensable and noncompensable tasks (*Heritage*, at p. 1010). Block billing can be particularly problematic when it makes it impossible to ascertain which tasks concerned, for example, a Brown Act violation for which statutory attorney fees are recoverable and other causes of action.  (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 689.)

That is not the problem Azulay identifies.  Azulay instead complains that the block billing here includes time spent on noncompensable "administrative" tasks.  Azulay points to tasks Ojeda's counsel performed such as scanning, printing, and downloading documents; preparing proofs of service; preparing mailings; formatting documents; calendaring dates; and traveling to mailboxes or postal centers to mail documents.

As an initial matter, necessary overhead support services that secretaries and paralegals provide to attorneys may be included in an attorney fees award.  (*City of Oakland v.*

*McCullough* (1996) 46 Cal.App.4th 1, 7.)  Therefore, so-called administrative tasks are recoverable in the trial court's discretion.  Although charging for purely clerical tasks at an attorney's hourly rate is questionable, the trial judge nonetheless was the best judge of the value of the services rendered, and to reverse that judgment we must be convinced it is clearly wrong. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)  Especially in the absence of the reporter's transcript, which may have shed light on the time spent on so-called administrative tasks, we are reluctant to second guess the trial court.  Ojeda's counsel was, in his words, a "true sole practitioner" in that he had no support staff and had to do everything himself.  His detailed time records largely show that when arguably clerical tasks were combined with clearly legal ones, the total time charged would not have been facially unreasonable for the legal task alone.  On February 14, 2018, for example, counsel drafted 15 sets of discovery, printed copies of each, drafted proofs of service, printed mailing labels, and stuffed manila envelopes.  To do all this he spent 5.4 hours.  Spending that time on drafting discovery alone would be facially reasonable.  Further, it is possible that the trial court denied Ojeda's request for a 1.5 multiplier, which the trial court might have otherwise awarded, as a way of ensuring that Ojeda was not compensated for performing clerical tasks.

We are therefore unpersuaded that the trial court abused its discretion by not reducing the fees.

B. *Small claims actions*

Azulay's second claim is Ojeda should not recover for time spent on related small claims matters.  Ojeda agreed to a reduction by 1.3 hours, or $552.50, but the trial court did not make the reduction.  We will do so on appeal.

C. *Prevailing on limited number of causes of action*

Azulay's third argument why Ojeda's fees are unreasonable centers on Ojeda having prevailed on only three of his eight causes of action.  At trial, the trial court granted nonsuit against Ojeda on his causes of action for failure to provide meal periods, failure to provide rest periods, failure to furnish accurate wage statements, failure to pay wages following severance of employment, and violation of Business and Professions Code section 17200.  Ojeda went to trial on the remaining three causes of action brought under the Labor Code for failure to pay minimum wage, failure to pay wages and overtime, and statutory liquidated damages for failure to pay minimum wage.

Although Ojeda prevailed on just three of his eight causes of action, it is unclear what Azulay is trying to make of this fact.  Azulay uses it to suggest, it appears, that Ojeda was not the prevailing party *and* that the fees are unreasonable.  But whether a party is the prevailing party and whether fees awarded are reasonable are distinct inquiries.  (*Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 153.)

If Azulay is attempting to assert that Ojeda was not the prevailing party, then that issue is not properly before us because Azulay did not raise it in the trial court and therefore may not raise it for the first time on appeal.  (See generally *JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.)  It would also, in any event, be incorrect, as Ojeda prevailed on causes of action entitling him to statutory attorney fees under Labor Code section 1194, subdivision (a).  As such, he is the prevailing party.  (See, e.g., *Graciano v. Robinson Ford Sales, Inc.*, *supra*, 144 Cal.App.4th at pp. 159–160.)

If, on the other hand, Azulay is asserting that the amount of fees awarded should be reduced to account for the causes of action on which Ojeda did not prevail, then this argument also was not raised in the trial court.  Rather, Azulay mentioned Ojeda's limited success as measured by the number of causes of action on which he prevailed only in the context of arguing why the 1.5 multiplier was improper.

Even so, apportionment is not required when claims for relief involve a common core of facts and are "so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units." (*Bell v. Vista Unified School Dist.*, *supra*, 82 Cal.App.4th at p. 687; *Graciano v. Robinson Ford Sales, Inc.*, *supra*, 144 Cal.App.4th at pp. 158–159.)  Whether and how to apportion attorney fees is in the trial court's sound discretion, and an abuse may be found when the claim subject to an attorney fees provision is separate and distinct from the claims that are not subject to such a provision.  (*Bell*, at pp. 687–688.)  No abuse of discretion is apparent here, where all of Ojeda's causes of action, including the dismissed ones, arose out of Ojeda's employment and Azulay's failure to comply with the Labor Code.  Azulay also makes no attempt to explain how the dismissed claims were separate and distinct from the ones Ojeda prevailed on at trial such that apportionment would be necessary.  As Ojeda's counsel explained, the dismissed causes of action were based on, for example, that he was not given a daily meal period, which was directly intertwined with how many hours he worked.

Finally, to the extent Azulay complains about the overall reasonableness of the attorney fees award, a trial court has considerable discretion in determining the reasonableness of fees.

In making this determination, the trial court may adjust the lodestar (the number of hours reasonably expended multiplied by the reasonable hourly rate) based on factors including (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorney, and (4) the contingent nature of the fee award.  (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1132.)  It may be, as Azulay points out, that this case was relatively straightforward and routine, involving no complex discovery issues or disputes, other pretrial matters, and did not involve a lengthy trial.  But it does not follow that the fees are unreasonable.  Rather, there is nothing patently outrageous about the number of hours spent (197.9) and counsel's hourly rate ($425) on a wage and hour claim case that went to trial, even a short one.

    D. *Disproportionality*

    Azulay's final issue regarding the attorney fees is that the trial court awarded Ojeda $30,929.94 in damages and $84,107.50 in attorney fees, which was almost three times the damages.  Azulay cites no authority for the proposition that a fee award that exceeds the client's recovery is per se unreasonable or that California imposes a proportionality rule.  (See generally *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 419–421 [rejecting three-to-one cap on fees to damages].)  Otherwise, as we have already said, nothing in the record persuades us that the award was unreasonable.

## DISPOSITION

The order granting attorney fees is modified to reduce the amount rewarded by $552.50.  The total amount of attorney fees awarded is $83,555.  The order is affirmed as modified.  No costs are awarded on appeal.

NOT TO BE PUBLISHED.


DHANIDINA, J.

We concur:


LAVIN, Acting P. J.


EGERTON, J.

Filed 10/27/20  Do v. Raytheon Company CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
### SECOND APPELLATE DISTRICT
### DIVISION FOUR

| | |
|---|---|
| TRISTAN DO,<br><br>    Plaintiff, Respondent, and Cross-Appellant<br><br>    v.<br><br>RAYTHEON COMPANY,<br><br>    Defendant, Appellant, and Cross-Respondent. | B293950<br><br>(Los Angeles County Super. Ct. No. BC603539) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Michelle Williams Court, Judge and Joanne B. O'Donnell, Judge. Affirmed.

    Pine Tillett Pine, Norman Pine, Scott Tillett, and R. Chris Lim; Barrera and Associates, Patricio T.D. Barrera; Vida M. Holguin for Plaintiff, Respondent, and Cross-Appellant.

    Gordon Rees Scully Mansukhani, Stephen E. Ronk, Christopher R. Wagner, and Erika L. Shao for Defendant, Appellant, and Cross-Respondent.

## INTRODUCTION

Tristan Do sued his employer, Raytheon Company, and his supervisor, Hector DeSimone, while on a stress-related medical leave of absence. Do alleged Raytheon and DeSimone discriminated against him based on his sexual orientation and subjected him to a hostile work environment. He also claimed Raytheon failed to accommodate him for disabling stress and PTSD caused by the discrimination and harassment he endured while working at the company.

The jury found in favor of Raytheon and DeSimone on Do's discrimination and harassment claims, but found Raytheon liable for failure to reasonably accommodate and failure to engage in the interactive process. It awarded Do compensatory damages totaling $1 million and $750,000 in punitive damages. The trial court later awarded attorneys' fees and costs to Do.

Raytheon appeals the judgment to the extent it held Raytheon liable for failure to reasonably accommodate and engage in the interactive process. Do cross-appeals, contending the trial court abused its discretion when determining the amount of attorneys' fees and costs awarded to him.

We affirm the judgment and the attorneys' fees and costs order.

## FACTUAL AND PROCEDURAL BACKGROUND

Do began working at Raytheon in 2004 as a mechanical engineer. Beginning in 2012, he reported directly to DeSimone. Just a few months into their working relationship, DeSimone started treating Do "differently," assigning Do a "heavier workload," treating Do "harsh[ly]," and yelling at him in meetings.

In 2013, Do suffered from Bell's Palsy, and took a six-week medical leave of absence. Do returned to work, but was "scared

2

that [his] Bell's Palsy would come back . . . ." In February 2015, as a result of DeSimone's continued alleged harassment, Do suffered from severe stress and took another medical leave of absence.

On December 8, 2015, while still on a stress-related medical leave of absence, Do filed a complaint against Raytheon and DeSimone alleging sexual orientation discrimination, constructive termination, assault and battery, harassment, retaliation, and failure to prevent discrimination and harassment. Do then filed a first amended complaint (FAC), adding two disability-related claims against Raytheon: (1) failure to reasonably accommodate; and (2) failure to engage in the interactive process. In the FAC, Do alleged that stress resulting from the continued harassment perpetrated by DeSimone caused him to take a stress-related medical leave of absence that continued up to the time he filed the FAC.

On February 17, 2017, while still on a leave of absence, Do sent an email to Raytheon stating, in part, that he would like to return to work and a "reasonable accommodation could include an attempt to return to work part-time to a Raytheon business located in LA County where [he] live[d], although [he] would consider Orange County" but he did "not believe that returning to work for the management who [he] believe[d] acted discriminatorily towards [him] and caused [his] physical and emotional injuries – including PTSD, [was] best for [his] recovery." Raytheon responded, stating it did not have "any open requisitions in Los Angeles [C]ounty" and "[t]he only position available [was] the position [he] held when [he] went out on a leave of absence, reporting to the same manager." The response omitted any reference to Orange County. Do did not return to work, and Raytheon terminated him on April 7, 2017.

Before trial, Raytheon filed a motion in limine to exclude evidence, argument, or testimony regarding Do's request for a new supervisor, asserting a request for a new supervisor as an

3

accommodation for a disability is per se unreasonable. The court denied the motion.

During trial,[1] Raytheon requested the trial court approve a special jury instruction based on a holding in *Higgins-Williams v. Sutter Medical Foundation* (2015) 237 Cal.App.4th 78, 84 (*Higgins-Williams*): "An employee's inability to work under a particular supervisor because of anxiety and stress related to the supervisor's standard oversight of the employee's job performance does not constitute a [mental] disability under FEHA. [Citation.]" Following argument, the court denied Raytheon's request, stating it would be "unduly confusing to the jury."

The jury found in favor of Raytheon on Do's claims for discrimination, retaliation, harassment, and failing to prevent discrimination or harassment. It found Raytheon liable, however, for failure to reasonably accommodate and failure to engage in the interactive process, and awarded Do compensatory damages totaling $1 million and $750,000 in punitive damages. It found in favor of DeSimone on all of Do's claims against him individually.

After the court entered judgment against Raytheon, the company moved for a new trial and filed a motion for judgment notwithstanding the verdict.[2] The court denied both motions.

Do filed a motion seeking to recover $1,996,766 in attorneys' fees, $55,322.29 in expert fees, and costs. Raytheon filed a motion to tax costs. The court awarded Do $695,090 in attorneys' fees. It explained the amount of fees sought "must be reduced to reflect issues relat[ing] solely to the discrimination, harassment and retaliation claims," on which Raytheon prevailed. The court denied Do's request for expert fees, and taxed Do's claimed costs by $5,273.65.

---

[1]    Judge Michelle Williams Court presided over the trial and ruled on the motions in limine.

[2]    The court entered a separate judgment in favor of DeSimone.

Raytheon appeals from the judgment and Do cross-appeals from the attorneys' fees and costs order.

## DISCUSSION

## I.   RAYTHEON'S APPEAL

### A.   Substantial Evidence Supported the Jury's Reasonable Accommodation Verdict

"Under [Government Code] section 12940,[3] it is an unlawful employment practice 'to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee' unless the employer demonstrates doing so would impose an undue hardship. (§ 12940, subd. (m).) The essential elements of a failure to accommodate claim are: (1) the plaintiff has a disability covered by . . . FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position [with accommodation]); and (3) the employer failed to reasonably accommodate the plaintiff's disability. [Citation.]" (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1192.)

Raytheon contends substantial evidence did not support the jury's reasonable accommodation verdict because: (1) Do did not suffer from a disability under FEHA; (2) Do's request to be transferred to a new supervisor was per se unreasonable; and (3) Do offered no evidence that an alternate position was available to him. We disagree for the reasons discussed below.

### 1.   Substantial Evidence of Do's Disability

A qualifying "'[m]ental disability'" under FEHA includes "any mental or psychological disorder . . . , such as  . . . emotional or mental illness" that "limits a major life activity." (§ 12926,

---

3    All further undesignated statutory references are to the Government Code.

subd. (j)(1).) The term "major life activity" is broadly construed and includes "physical, mental and social activities, and working[ ]" (*id.*, subd. (j)(1)(C)); "limits" means the achievement of a major life activity is made difficult. (*id.*, subds. (j)(1)(A) & (B)). Further, under California law, "'working' is a major life activity," whether or not "the actual or perceived working limitation implicates a particular employment or a class or broad range of employments." (§ 12926.1, subd. (c).)

Here, Do was diagnosed with "post-traumatic stress disorder from hostile work environment" and "major depressive disorder recurrent episode severe." Do received ongoing treatment for his mental disabilities by two medical professionals, and was prescribed medication. Do's treating psychiatrist testified that, at the time of trial, he could return to work in a "non-hostile environment," but he was not able to return to work in 2015 or 2016.

Raytheon concedes PTSD and depression generally qualify as disabilities entitled to protection under FEHA. It argues, however, that based on *Higgins-Williams*, *supra*, 237 Cal.App.4th 78, Do's conditions are not disabilities under FEHA because he could perform his job as an engineer at Raytheon, just not under DeSimone's supervision. We are unpersuaded.

In *Higgins-Williams*, plaintiff's treating physician diagnosed her with "adjustment disorder with anxiety," and "reported plaintiff's disabling condition as "'stress[] when dealing with her Human Resources and her manager.'"" (*Higgins-Williams, supra*, 237 Cal.App.4th at p. 81.) Based on the physician's diagnosis, the company granted plaintiff a stress-related leave of absence from work. (*Ibid.*) When plaintiff returned to work, her supervisor began singling her out for negative treatment, was curt and abrupt with her, and on one occasion "grabbed plaintiff's arm and yelled at her, after which plaintiff suffered a panic attack, left work, and never returned." (*Id.* at p. 82.) Plaintiff submitted a disability accommodation

6

request form, requesting a transfer to a different department under a different supervisor. (*Ibid*.) Thereafter, her treating physician recommended extending the leave two more months. When the company refused and plaintiff did not return to work, the company fired her. (*Id*. at pp. 82-83.) Plaintiff sued the company for disability discrimination, failing to engage in an interactive process, failing to make reasonable accommodations, retaliation, and wrongful termination. (*Id*. at p. 81.) The Third Appellate District affirmed the trial court's grant of summary judgment in favor of the company, holding "an employee's inability to work under a particular supervisor because of anxiety and stress related to the supervisor's standard oversight of the employee's job performance does not constitute a disability under FEHA. [Citations.]" (*Id*. at p. 84.)

Even assuming we agree with the holding in *Higgins-Williams*, an issue we will address below in section I.B, the record contains substantial evidence from which the jury could have concluded DeSimone's actions did not constitute "standard oversight." For example, Do testified DeSimone yelled at him in group meetings and treated him more "harshly" than other employees DeSimone supervised. One of Do's coworkers, Mr. Shakeridge, testified he observed DeSimone treating Do with "hostility" at status meetings and "everybody became uncomfortable" in the meetings. Another coworker, Ms. Munoz, testified she observed DeSimone treating Do "poorly" and DeSimone "picked on [Do]." She further testified she left a meeting once after observing DeSimone get "heated at [Do] probably about nothing" and it was "very uncomfortable to watch it."

That the jury concluded Do was not harassed or discriminated against based on his sexual orientation does not mean DeSimone acted appropriately and exercised "standard oversight." We therefore conclude substantial evidence supports

7

the jury's finding that Do suffered from a FEHA-protected disability, i.e., a disability that limited his ability to work.

## 2.    Do's Transfer Request was Not Unreasonable as a Matter of Law

"'Reasonable accommodation' is defined in . . . FEHA and its implementing regulations only by way of example. [Citations.]" (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 972, fn. omitted.) Reasonable accommodation may include "reassignment to a vacant position." (§ 12926, subd. (p)(2); Cal. Code Regs., tit. 2, § 11065, subd. (p)(2)(N); see also *id*., § 11068, subd. (d)(1)(A) ["As a reasonable accommodation, an employer or other covered entity shall ascertain through the interactive process suitable alternate, vacant positions and offer an employee such positions, for which the employee is qualified, under the following circumstances: [¶] (A) if the employee can no longer perform the essential functions of his or her own position even with accommodation . . . ."].)

Ignoring the plain language of FEHA, Raytheon relies on an unpublished federal district court opinion (*Alsup v. U.S. Bancorp* (E.D. Cal., Jan. 15, 2015, No. 2:14-CV-01515-KJM-DAD) 2015 U.S. Dist. LEXIS 5100 (*Alsup*)) to argue Do's request for a transfer was unreasonable as a matter of law. While unpublished federal district court opinions are citable, they do not constitute binding authority. (*City of Hawthrone ex rel. Wohlner v. H&C Disposal Co*. (2003) 109 Cal.App.4th 1668, 1678, fn. 5.) We decline to follow *Alsup*.

There, plaintiff alleged she requested a transfer to a new department because she suffered from severe depression and acute anxiety stemming from her supervisor treating her "'in a negative and devaluing manner'" and making comments "'of an unwelcome sexual nature . . . .' [Citation.]" (*Alsup, supra*, 2015 U.S. Dist. LEXIS at p. 2.) The court held plaintiff failed to state a

claim for failure to accommodate because "the plaintiff's requested accommodation, transfer to a new position under a new supervisor, is unreasonable as a matter of law." (*Id.* at p. 19.) We find the court's reasoning in *Alsup* unpersuasive. After citing to out-of-state cases, the *Alsup* court stated that even without the benefit of those cases, plaintiff has not stated a claim because "[p]laintiff's work environment could not have been modified or adjusted in a manner that would have enabled the plaintiff to perform the functions of her job." (*Ibid.*)

*Alsup* predates the #MeToo movement and is out of step with current law. If the supervisor indeed made unwelcome sexual advances and was otherwise demeaning the employee, firing or disciplining the supervisor and/or placing the employee under a different supervisor would have been warranted and would be obvious, reasonable accommodations that would permit the employee to return to work. Similarly, Do's work environment could have been adjusted (e.g., by transferring Do to another supervisor or replacing DeSimone) so that Do could perform the essential functions of his job. We therefore decline to follow *Alsup* and conclude its purported per se rule — that transferring an employee to a vacant position under a new supervisor can never be a reasonable accommodation — is inconsistent with FEHA.

### 3.   Substantial Evidence of an Alternative Position

Alternatively, Raytheon contends Do offered no evidence that another position was available to him.[4] "If the employee cannot be accommodated in his or her existing position and the

---

[4]   Raytheon and Do disagree on who bears the burden of proof at trial to demonstrate a reasonable accommodation existed. Even assuming Do had the burden of proving a vacant position existed, substantial evidence supports the reasonable accommodation verdict.

requested accommodation is reassignment, an employer must make affirmative efforts to determine whether a position is available. [Citation.]" (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1223.) Raytheon argues when Do "finally asked HR about other positions, Raytheon investigated and found no vacant position available, other than the position he held when he went out on disability." Substantial evidence, however, supports a contrary conclusion.

First, in response to Do's request to transfer to another position in Los Angeles or Orange County, Raytheon responded it did not have "any open requisitions in Los Angeles [C]ounty." It did not advise Do whether vacant positions existed in Orange County, however. Second, Do testified he sought an open position as a project manager. Do testified he was qualified for the position and that one person applied after he did, and nevertheless received an interview. Although FEHA does not require an employer to promote a disabled employee as an accommodation, this was not the reason Raytheon provided for declining to consider Do for the vacant project manager position. Instead, Raytheon claimed Do waited too long and the position had been filled. "We do not reweigh evidence or assess the credibility of witnesses on review for substantial evidence. [Citation.]" (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292.) We therefore conclude there is substantial evidence in the record from which a jury could conclude a vacant position was available, and the reason Raytheon gave for not considering Do for the project manager position was pretextual.

**B.    The Trial Court Did Not Abuse its Discretion by Declining to Give the *Higgins-Williams* Jury Instruction**

Raytheon contends the trial court abused its discretion by refusing to give a special jury instruction based on the holding in

*Higgins-Williams*: "An employee's inability to work under a particular supervisor because of anxiety and stress related to the supervisor's standard oversight of the employee's job performance does not constitute a [mental] disability under FEHA." We agree with the trial court's conclusion that the proposed instruction would be "unduly confusing to the jury."

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) A party is not entitled, however to instructions that incorrectly state the applicable law (see, e.g., *Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 333-335), or instructions that are confusing or misleading. (*Harris v. Oaks Shopping Center* (1999) 70 Cal.App.4th 206, 209-210.) When a proposed instruction is erroneous, misleading, or incomplete, the trial court may properly reject the instruction and is not required to modify or correct it. (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1673.)

As discussed above, a qualifying mental disability under FEHA includes any mental illness that limits the person's ability to work. (§ 12926, subd. (j)(1)(C).) In concluding that a mental disability "related to the supervisor's standard oversight" does not constitute a disability under FEHA, the *Higgins-Williams* court relied on *Hobson v. Raychem Corp.* (1999) 73 Cal.App.4th 614, 618 (*Hobson*). (*Higgins-Williams*, *supra*, 237 Cal.App.4th at p. 84.) In *Hobson*, the court held "the inability to perform one particular job, or to work under a particular supervisor, does not constitute a qualified disability" under FEHA. (*Hobson, supra*, 73 Cal.App.4th at p. 628.) But as noted by the *Higgins-Williams* court, *Hobson* applied "the narrower federal test of disability of '*substantially* limits' a major life activity, rather than the broader California test of simply 'limits,'" and *Hobson* was disapproved on that point by our Supreme Court in *Colmenares v. Braemar*

11

*Country Club, Inc.* (2003) 29 Cal.4th 1019, 1031, fn. 6. (*Higgins-Williams*, *supra*, 237 Cal.App.4th at p. 84.) The court in *Higgins-Williams* concluded, however, the holding it relied on in *Hobson* (i.e., the inability to perform one particular job, or to work under a particular supervisor, does not constitute a qualified disability) remains good law. (*Id.* at pp. 85-86.) Even assuming we agree, it is not at all clear that the holding the *Higgins-Williams* court extracts from *Hobson* is a correct statement of law, i.e., that whether an employee suffers from a FEHA-protected disability is dependent on whether the supervisor practiced "standard oversight."

In any event, the phrase "standard oversight" is ambiguous. This point is underscored by the facts in *Higgins-Williams*. There, the court held the supervisor's actions constituted standard oversight: "As for the alleged nonstandard supervisorial oversight, all plaintiff can muster is that [the supervisor] began singling plaintiff out for negative treatment on September 8, 2010, and that on the very next day, [the supervisor] grabbed plaintiff's arm and yelled at her, after which plaintiff suffered a panic attack, left work, and never returned." (*Higgins-Williams, supra*, 237 Cal.App.4th at p. 86, fn. 2.) If it was ever standard workplace conduct for a supervisor to grab and yell at an employee, that time has long passed. We therefore conclude the proposed jury instruction had the potential of confusing and misleading the jury because it did not define "standard oversight." And, Raytheon could have, but did not, request a revised instruction. It is not the trial court's duty to modify the proposed instruction. (*Boeken v. Philip Morris, Inc.*, *supra*, 127 Cal.App.4th at p. 1674.) Moreover, even if we were persuaded the court erred in declining to give the proposed instruction, Raytheon failed to demonstrate prejudice. The record on appeal does not include a complete set of jury instructions from which we could determine whether it is reasonably probable a different result would have been reached if the refused

instruction had been given. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580-581 ["when deciding whether an error of instructional omission was prejudicial, the court must [] evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled."].)

### C. Substantial Evidence Supported the Jury's Interactive Process Verdict

"Under FEHA, an employer must engage in a good faith interactive process with the disabled employee to explore the alternatives to accommodate the disability. [Citation.]" (*Wysinger v. Auto. Club of Southern California* (2007) 157 Cal.App.4th 413, 424, citing § 12940, subd. (n).) Raytheon contends substantial evidence did not support the jury's interactive process verdict for the same reasons it contends substantial evidence did not support the reasonable accommodation verdict: Do failed to identify a reasonable accommodation; Do's request to be transferred to a new supervisor was unreasonable as a matter of law; and Do did not suffer from a recognized disability under FEHA. We reject these contentions for the reasons discussed above.

## II.   DO'S CROSS-APPEAL

After trial, Do moved for an award of attorneys' fees of $1,996,766 ($998,383 with a multiplier of 2.0) and expert fees of $55,322.29. The judge[5] awarded attorneys' fees in the amount of $695,090, but denied the request for expert witness fees. She also taxed Do's claimed costs by $5,273.65. Do contends the court abused its discretion when determining the attorneys' fees and costs award by (1) refusing to award a multiplier; (2) decreasing

---

[5]      Judge Joanne B. O'Donnell heard the attorneys' fee motion.

the lodestar to account for limited success; (3) denying expert witness fees; and (4) taxing costs. We disagree.

### A.     Governing Legal Principles and Standard of Review

Under FEHA, the court, in its discretion, may award reasonable attorneys' fees and costs to the prevailing party. (§ 12965, subd. (b).) "[I]n exercising its discretion, a trial court should ordinarily award attorney[s'] fees to a prevailing plaintiff, unless special circumstances would render an award of fees unjust." (*Young v. Exxon Mobil Corp.* (2008) 168 Cal.App.4th 1467, 1474.) To calculate the fee award, the trial court first determines the lodestar, i.e., the number of hours worked multiplied by a reasonable hourly fee. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1249.) The trial court may increase the lodestar by applying a multiplier or enhancement if it finds other factors weigh in favor of a higher fee. (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1171.)

We review a trial court's attorneys' fees award for abuse of discretion, and we presume the trial court considered all appropriate factors in selecting the lodestar and applying a multiplier. (*Taylor v. Nabors Drilling USA, LP*, *supra*, 222 Cal.App.4th at pp. 1249-1250.) The judge is in the best position to determine the value of professional services rendered in his or her court. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*).) The award will not be disturbed unless we are convinced that it is clearly wrong. (*Ibid.*)

### B.     Rejection of 2.0 Multiplier

A court has the discretion to apply a multiplier or fee enhancement to the lodestar figure to take into account a variety of factors, including "(1) the novelty and difficulty of the

questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).)

Here, the experienced judge assessed the *Ketchum* factors and declined to award a multiplier: "This was a lengthy employment case based on FEHA. It was fact-intensive, but so are all such cases. It took approximately three years to get to trial, and there was considerable litigation since judgment. But the case was not so consuming that it would reasonably preclude any other employment. There were times when the litigation was intensive, but other times when it was not. It was a contingent fee case, but so are virtually all employment cases. The hourly rates awarded are on the high side of reasonable, based on the skill of plaintiff's attorneys. Plaintiff did not prevail on a significant number of his claims."

Do contends that absent a multiplier, "contingency attorneys cannot be fairly compensated compared to lawyers paid an hourly-fee." But our Supreme Court made clear "the trial court is not required to include a fee enhancement to the basic lodestar figure for contingent risk . . . ." (*Ketchum, supra*, 24 Cal.4th at p. 1138; see also *Green v. Dillingham Constr. N.A.* (2002) 101 Cal.App.4th 418, 428-249 (*Green*) [remanding to the trial court to "exercise its discretion on whether a fee enhancement is merited" for "contingent risk" because the trial court incorrectly determined it was not permitted to enhance the fee award based on contingent risk].) Here, unlike in *Green*, the judge recognized the contingent risk was *a* factor it could rely on in adjusting the lodestar figure, but properly exercised its discretion in declining

to apply a multiplier after applying *all* the *Ketchum* factors to the facts of this case.[6]

## C.     Decrease in Lodestar

"[A] prevailing party generally may not recover for work on causes of action on which the party was unsuccessful. [Citation.]" (*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 342.) In evaluating the impact "limited success" has on an award of attorneys' fees, California applies the two-step test outlined in *Hensley v. Eckerhart* (1983) 461 U.S. 424 [103 S.Ct. 1933; 76 L.Ed.2d 40] (*Hensley*). First, the trial court must evaluate "whether 'the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded[.]'" (*Environmental Protection Information Center. v. Department of Forestry & Fire Protecti*on (2010) 190 Cal.App.4th 217, 239 (*Environmental*), quoting *Hensley, supra*, 461 U.S. at p. 434.) Second, if the court finds that successful and unsuccessful claims are related, "the court proceeds to the second step of [the] *Hensley* inquiry, which asks whether 'the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.'" (*Environmental, supra,* 190 Cal.App.4th 217, 239, quoting *Hensley, supra*, 461 U.S. at p. 434.) "Full compensation may be appropriate where the plaintiff has obtained 'excellent results,' but may be excessive if 'a plaintiff has achieved only partial or limited success.'" ( *Environmental, supra,* 190 Cal.App.4th 217, 239, quoting *Hensley*, *supra*, 461 U.S. at pp. 435, 436.)

---

[6]     Do repeatedly refers to this case as a "public interest case" to justify a multiplier, but he does not claim that his success on his two disability FEHA claims "had any broad public impact or resulted in significant benefit to anyone other than himself." (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 990.)

16

The trial court acknowledged "[t]here were a large number of facts, the significance of which had to be considered in the totality of the circumstances, which formed a common core of facts in all of the causes of action." It further observed "not all facts were intertwined," however: "There were distinctive facts in the disability claims, on which Plaintiff prevailed, and the claims based on discrimination, harassment, and retaliation on which Plaintiff did not prevail." The court therefore held "[t]he claimed amount must be reduced to reflect the issues related solely to the discrimination, harassment and retaliation claims."

Do argues the trial court abused its discretion because it "was operating under the mistaken belief that" it was *required* to reduce fees to account for distinctive facts related to the claims on which Do did not prevail. We disagree. The trial court's statement that fees "must be reduced to reflect the issues related solely" to claims on which Do was unsuccessful is a correct application of the law. (See *Chavez v. City of Los Angeles*, *supra*, 47 Cal.4th at p. 989 ["If a plaintiff has prevailed on some claims but not others, fees are not awarded for time spent litigating claims unrelated to the successful claims, and the trial court 'should award only that amount of fees that is reasonable in relation to the results obtained.' [Citation.]"].)

Do's alternative argument that this was not a limited success case because "the special verdict form was undifferentiated, entitling [Do] to the entire jury award whether he prevailed on some or all of his claims" also has no merit. The special jury form indicates Do prevailed on two of his eight claims. That the jury form awards a lump sum (as opposed to a separate damages award for each of the disability claims) does not mean Do "enjoyed complete" success. It is unreasonable to infer, as Do urges us to do, that even if Do prevailed on all his disability claims, the jury may not have awarded him any additional damages.

Finally, Do claims the court erred in not identifying the "distinctive facts" related solely to the unsuccessful claims. But it is not the court's duty to make specific factual findings explaining its calculation of the fee award. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1250-1251 (*Taylor*), quoting *California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 754-755 ["'In California, the trial court has no sua sponte duty to make specific factual findings explaining its calculation of the fee award and the appellate courts will infer all findings exist to support the trial court's determination. [Citations.] . . . . [I]t is incumbent on the party who is dissatisfied with the court's calculation of the number of allowable hours to request specific findings.' [Citation.] Appellant 'did not request specific findings and therefore may not now complain on appeal that [it does] not know which particular hours the court eliminated.' [Citation."].) Like the appellant in *Taylor*, Do failed to request additional specific findings from the trial court; therefore, he is precluded from doing so on appeal.[7] We conclude the trial court did not abuse its discretion by reducing the lodestar by 20% to account for Do's lack of success on a majority of his claims.

Do also challenges the trial court's reduction of the hourly fees of three of the seven timekeepers included in his motion for attorneys' fees. The trial court reduced Mr. Barrera's hourly rate from $800 to $750, Mr. Holguin's hourly rate from $800 to $700, and Ms. Lauzon's rate from $600 to $550. "The value of legal

---

[7]     For the same reason, we reject Do's contention that the trial court erred in reducing the lodestar for unspecified duplicate billing and billing for clerical/secretarial duties. It is not the trial court's duty to identify specific hours it eliminated when calculating the attorneys' fee award. (*Taylor, supra,* 222 Cal.App.4th at pp. 1250-1251.) As Do's counsel acknowledged at the hearing on the attorneys' fee motion, reviewing attorneys' fee requests at the conclusion of trial takes an immense amount of time: "It looks like a lot of time went into this. It looks like the papers were read and reconsidered, and we appreciate that."

services performed in a case is a matter in which the trial court has its own expertise. [Citation.]" (*PLCM Group, supra*, 22 Cal.4th at p. 1096.) On appeal, we will not disturb the trial court's modest reduction in hourly rates where, in the court's judgment, "[s]ome of the requested hourly rates [were] unreasonably high[.]"

### D.   Expert Witness Fees

Under Code of Civil Procedure section 998, subdivision (d), the trial court has discretion to award expert witness fees to a plaintiff if plaintiff's settlement offer was rejected and he later obtains a more favorable judgment. The trial court declined to award expert fees because Do "failed to sufficiently support his request for expert witness fees." The trial court's conclusion is supported by the record.

Do requested $55,322.29 in expert fees. The majority of the expert fees requested related to fees incurred by experts who did not testify at trial. Although a trial court may award fees spent on experts who did not actually testify (see *Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 124), plaintiff must demonstrate the fees were "reasonably necessary . . . [in the] preparation for trial . . . ." (Code Civ. Proc., § 998, subd. (d).)

Here, Do's counsel stated he "was required to engage expert witnesses," but failed to offer any explanation regarding why the expert fees were "reasonably necessary."[8] The supporting documentation also lacked specificity. For example, in support of expert fees incurred by Mr. Robbins, Do attached a "Balance Due" statement showing $40,899.68 in fees and $322.61 in interest, but

---

[8]     Do's counsel's description of Mr. Robbins' services, for which Do sought $52,458, was limited to: "review of four Raytheon investigations, relevant deposition transcripts, preparation."

providing no detail regarding the work performed. On this record, it was well within the trial court's discretion to deny Do's request for expert fees.

### E.    Costs

"Generally, the prevailing party in 'any action or proceeding' is entitled to costs as a matter of right." (*Huerta v. Kava Holdings, Inc.* (2018) 29 Cal.App.5th 74, 79 (*Huerta*), quoting Code Civ. Proc., § 1032, subd. (b).) An award of costs to the prevailing party in a FEHA action, however, "is never a matter of right, but is always within a trial court's discretion." (*Huerta, supra*, 29 Cal.App.5th at p. 80, citing § 12965, subd. (b); see also *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 108 (*Williams*) [holding "section 12965, subdivision (b) [is] an exception to Code of Civil Procedure section 1032, subdivision (b), mak[ing] an award of ordinary costs to a prevailing FEHA party discretionary rather than mandatory . . . ."].)

Here, the court granted Raytheon's motion to tax costs for the following: (1) travel expenses totaling $471.50; (2) attorney service and messenger costs totaling $415; and (3) mock trial and jury consultants totaling $4,487.15.

Do challenges the court's ruling on travel expenses because the trial court, he contends, improperly relied on Code of Civil Procedure section 1033.5, subdivision (a)(3).[9] As stated above, section 12965, subdivision (b) governs the award of costs in FEHA cases. Our Supreme Court held, however, "the definition of allowable costs in Code of Civil Procedure section 1033.5 governs the *type* of costs that may be awarded under Government Code section 12965, subdivision (b)[.]" (*Williams, supra,* 61 Cal.4th at

---

[9]    The only travel expenses authorized by Code of Civil Procedure section 1033.5 are those to attend depositions. (Code Civ. Proc., § 1033.5, subd. (a)(3).)

p. 106 [Emphasis in original].) Thus, the trial court correctly relied on Code of Civil Procedure section 1033.5.

Do also contends the messenger fees, mock trial expenses, and jury consultant expenses were reasonably necessary costs, and therefore should not have been taxed. The trial court found Do "failed to meet his burden of supporting the necessity of messenger fees." This finding is consistent with Code of Civil Procedure section 1033.5, subdivision (a)(14), which states fees "for the electronic filing or service of documents" are recoverable costs, but does not include messenger fees. (See *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 132 ["Messenger fees are not expressly authorized by statute, but may be allowed in the discretion of the court. [Citations.]"].) Regarding mock trial expenses, the trial court explained: "Although plaintiff states the mock trial was helpful in determining trial strategy and shortened the trial, no specifics of how this occurred were provided and the Court cannot find that it was reasonably necessary." Similarly, regarding jury consultant expenses, the trial court found Do "failed to meet its burden of establishing that this was a reasonably necessary expense." We find no abuse of discretion.

## DISPOSITION

The judgment and attorneys' fees and costs order are affirmed. The parties are to bear their own costs on appeal.

CURREY, J.

We concur:

MANELLA, P.J.

WILLHITE, J.